773 A.2d 167

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Ricardo NATIVIDAD, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 18, 1999.

Decided June 25, 2001.

Saylor, J., concurred in the result.

Zappala, J., filed a concurring and dissenting opinion in which Flaherty, C.J., joined.

Nigro, J., filed a concurring and dissenting opinion.

Donald M. Padova, Philadelphia, for appellant, Ricardo Natividad.

Catherine Marshall, Hugh J. Burns, Jr., Philadelphia, for appellee, Com.

Robert A. Graci, Harrisburg, for appellee, Office of Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

CAPPY, Justice.

This is a direct appeal from the sentence of death imposed by the Court of Common Pleas of Philadelphia County. The Supreme Court of Pennsylvania has appellate jurisdiction over direct appeals from the imposition of a sentence of death. 42 Pa.C.S. §§ 722(4) and 9711(h)(1).

In the early morning hours of November 9, 1996, Michael Havens was robbed at gunpoint and his dark blue Lincoln was stolen. On the night of November 9, 1996, Robert Campbell was shot during a robbery; the shooter fled in a dark Lincoln. Appellant was charged in separate indictments for the robbery of Michael Havens and the murder of Robert Campbell. The two indictments were consolidated for trial. On November 10, 1997, a jury convicted appellant of first degree murder in the death of Robert Campbell. 18 Pa.C.S. § 2502(a). Appellant was also convicted of carrying a firearm on a public street, 18 Pa.C.S. § 6108, two counts of possession of an instrument of crime, 18 Pa.C.S. § 907, two counts of robbery, 18 Pa.C.S. § 3701, one count of robbery of a motor vehicle, 18 Pa.C.S. § 3702, kidnapping, 18 Pa.C.S. § 2901, and criminal conspiracy, 18 Pa.C.S. § 903.

At the penalty phase, the jury found two aggravating circumstances: that the killing occurred while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); and that the defendant had a significant history of felony convictions involving the use or threat of violence, 42 Pa.C.S. § 9711(d)(9). The jury found one mitigating circumstance, the life history of the defendant, 42 Pa.C.S. § 9711(e)(8). The jury determined that

the aggravating circumstances outweighed the mitigating circumstance and rendered a verdict of death. Post verdict motions were denied and the trial court formally imposed the sentence of death for the conviction of murder in the first degree. Additional sentences were imposed at the remaining charges.[1] An automatic direct appeal followed from the judgment of sentence.

Although appellant has not specifically challenged the sufficiency of the evidence supporting the conviction of first degree murder, in all cases where the death penalty has been imposed, this Court automatically conducts such a review. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g. denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). When reviewing the sufficiency of the evidence, we must determine whether the evidence and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, support the jury's finding that all elements of the offense have been established beyond a reasonable doubt. *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190, 195 (1997), *cert. denied*, 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). The evidence is sufficient to sustain a conviction for first degree murder where the Commonwealth establishes that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the accused did the killing, and that the killing was done with premeditation or deliberation. *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624, 626 (1991).

1. Sentence was also imposed on the additional convictions. On bill of indictment No. 13, April Term 1997, as to the crimes against Robert Campbell, in addition to the sentence of death; ten to twenty years for robbery, one to two years for carrying firearms and two to five years for possessing an instrument of crime. All sentences above to run concurrent. On bill of indictment No. 312, August Term 1997, as to the crimes against Michael Havens; ten to twenty years for kidnapping, ten to twenty years for robbery, consecutive to kidnapping and to the robbery at bill of indictment No. 13, but concurrent to the sentence of death. Also at bill of indictment No. 13, concurrent terms of ten to twenty years for robbery of a motor vehicle, five to ten years for conspiracy, one to two years for carrying firearms and two to five years for possessing an instrument of crime.

The Commonwealth may prove specific intent to kill by circumstantial evidence. *Commonwealth v. Wilson*, 543 Pa. 429, 672 A.2d 293, 297 (1996). The specific intent to kill may be proven by the use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Bond*, 539 Pa. 299, 652 A.2d 308, 311 (1995).

The evidence presented at trial established appellant's involvement in certain activities beginning at 2:00 a.m. on November 9, 1996 and continuing through to approximately 11:00 p.m., November 9, 1996. About 2:00 a.m. on November 9, 1996, Michael Havens stopped to get a sandwich at Philly's Famous Cheesesteaks at the intersection of Island and Elmwood Avenues in Philadelphia. (Notes of testimony, hereinafter "N.T.", 11/5/97 p. 147–148). Upon returning to his car with the sandwich, Mr. Havens was approached by two men. (N.T. 11/5/97, p. 149). Mr. Havens' car was a dark blue Lincoln that he recently had purchased. (N.T. 11/5/97, p. 146). As Mr. Havens was entering the combination to unlock the front driver's door of the Lincoln, appellant interrupted Mr. Havens by pointing a stainless steel revolver with rubber grips at him. (N.T. 11/5/97, p. 149). Another man, acting in concert with appellant, approached Mr. Havens at the same time, standing behind him while appellant faced him with the gun. Mr. Havens gave his wallet and car keys to appellant. Appellant ordered Mr. Havens into the car. When Mr. Havens hesitated, appellant threatened to kill him in the parking lot if he refused to get into the car.

Mr. Havens sat in the back seat of the car. Appellant sat in the front seat of the car on the passenger side. Appellant sat facing Mr. Havens, with the gun aimed at Mr. Havens throughout the time they were in the car. Appellant's accomplice drove the vehicle. (N.T. 11/5/97, p. 149–154). Over the next fifteen to twenty minutes, appellant repeatedly threatened to shoot Mr. Havens while demanding more money from him. Mr. Havens gave appellant and his accomplice the cash from his pocket and begged to be released from the vehicle. Appellant requested Mr. Havens' money access card and that Mr. Havens access the account to get them additional funds.

Mr. Havens responded that there was no money in the account as he had just paid bills. Appellant continued to threaten Mr. Havens with the firearm. Finally, the men pulled the car to the side of the road. Mr. Havens was ordered out of the car and told to prepare to die by appellant. Appellant directed Mr. Havens to turn his back and remain standing. While Mr. Havens complied, appellant fled. Upon realizing that he was alone, Mr. Havens walked to a nearby store, called for assistance and reported the incident to police. (N.T. 11/5/97, p. 154).

At approximately 7:00 p.m. on the evening of November 9, 1996, appellant, driving a blue Lincoln, met his friend, Byron Price, near 60th and Catherine Streets in Philadelphia. Mr. Price testified that this was the first time he had seen appellant in possession of a dark blue Lincoln. (N.T. 11/6/97, p. 8). The two men planned to spend the evening together watching a boxing match. Mr. Price sat in the passenger seat of the Lincoln; appellant drove. Appellant pulled the car into an EXXON gasoline station at the corner of 60th and Catherine Streets. Appellant told Mr. Price to wait. While sitting in the car, Mr. Price heard a gunshot. (N.T. 11/6/97, p. 9). Appellant ran back to the car with a chrome revolver in his hand. Mr. Price noticed that a man he had formerly observed standing by a car in the gas station was now lying on the ground. Dropping the gun in his lap, appellant quickly made a U-turn out of the EXXON station and sped away on 60th Street. Mr. Price asked appellant why he shot the man. Appellant replied, "he drew on me." (N.T. 11/6/97, p. 15).

Mr. and Mrs. Johnson had been leaving their home across the street from the EXXON station at the time of the shooting. (N.T. 11/6/97, pp. 76, 92). They were unable to identify appellant; however, they testified that the shooter left the EXXON station in a dark Lincoln. (N.T. 11/6/97, pp. 78, 94). They each, independently, testified to the following observation: the victim raised his hands in the air and then fell backwards at the same time that a gunshot was heard. The shooter was wearing a lumberjack style jacket at the time of the incident. After the gunshot, the shooter jumped into the

driver's side of a dark Lincoln and sped away on 60th Street. (N.T. 11/6/97, pp. 82, 93).

On November 11, 1996, Philadelphia police recovered a dark blue Lincoln that had been abandoned and set on fire. (N.T. 11/5/97, p. 197). From the trunk of the car, the police recovered a lumberjack style jacket. Mr. Havens identified the burnt Lincoln as the car appellant had stolen from him at gunpoint on the morning of November 9, 1996. (N.T. 11/5/97, p. 157). Mr. Havens also identified the jacket recovered from the trunk of the car as his own jacket that he had left in the car at the time of the robbery. (N.T. 11/5/97, p. 158).

The day after the murder, appellant made statements to several of his acquaintances taking credit for having shot the man at the EXXON station. (N.T. 11/6/97, pp. 156, 163, 182). Several weeks after the incident, appellant approached his friend Keith Smith while Mr. Smith was helping Carl Harris wash Mr. Harris's car. (N.T. 11/6/97, p. 107). Mr. Harris testified that he observed Mr. Smith and appellant engage in a conversation, out of his hearing, and then walk around the corner from where Mr. Harris was standing. (N.T. 11/6/97, p. 110). When Mr. Smith returned after parting from appellant, Mr. Smith had in his possession a chrome .357–Magnum firearm. (N.T. 11/6/97, p. 114). Sometime in December of 1996, Mr. Smith gave a .357 revolver to his attorney, Mr. Spina. (N.T. 11/7/97, p. 15). Attorney Spina immediately notified Philadelphia homicide detectives that he had the gun in his possession. (N.T. 11/7/97, p. 16). The homicide detectives recovered the revolver from Mr. Spina's office and turned it over to the Philadelphia crime lab for testing.

Based on information received in their investigation, the police obtained an arrest warrant for appellant in December of 1996. (N.T. 11/7/97, p. 128). However, it was not until March 17, 1997 that appellant was apprehended. Following appellant's arrest, Mr. Havens, the victim of the robbery of the Lincoln, came to the police station to view a photographic array. Upon viewing the array, Mr. Havens positively identified a photograph of appellant. (N.T. 11/5/97, p. 173).

The results of forensic and pathology reports revealed that Mr. Campbell had been shot in the head at a distance of at least two feet causing his immediate death. (N.T. 11/5/97, p. 230). The fatal wound was consistent with the type of injury caused by a .357 Magnum firearm. (N.T. 11/5/97, p. 232). The .357 Magnum obtained by police from the office of Mr. Spina had been fired prior to being handed over to the police. (N.T. 11/7/97, pp. 41–42). Mr. Havens identified the gun recovered from Mr. Spina's office as identical to the gun held on him by appellant·during the robbery of his motor vehicle. (N.T. 11/5/97, p. 170). Mr. Price identified the gun appellant possessed after shooting Mr. Campbell as similar in appearance to the gun Mr. Spina delivered to the Philadelphia police. (N.T. 11/6/97, p. 13).

Based upon the above-presented facts, sufficient evidence was established to support beyond a reasonable doubt appellant's conviction for first degree murder in the death of Robert Campbell. We will now proceed to address appellant's allegations of error. We note that we will not be addressing these allegations in the order presented in appellant's brief, choosing instead to address the claims regarding trial error before turning to the claims regarding error in the penalty phase of the proceedings.

■ In his first claim, appellant alleges that the court erred in failing to sever the two indictments at issue. As revealed in the above summary of the facts, appellant was tried on consolidated indictments. One indictment charged appellant for the robbery of a motor vehicle, and the robbery and kidnapping of Michael Havens with the use of a firearm. The second incident concerned the robbery and shooting of Robert Campbell. The Commonwealth had moved, prior to trial, to consolidate the two indictments, as the circumstantial evidence from the crimes involving Mr. Havens implicated appellant in the shooting of Mr. Campbell. The Commonwealth's motion was granted over appellant's objection. Appellant renewed his objection to consolidation and requested the indictments be severed immediately prior to trial. Appellant now claims that

he was subject to overwhelming prejudice because of the consolidation of the two indictments.

Crimes charged in separate indictments may be tried together where the evidence of each of the offenses would be admissible in a separate trial for the other and the evidence is capable of separation by the jury so that there is no danger of confusion. Pa.R.Crim.P. 1127(A)(1)(a) and (b). Whether indictments should be joined or severed is a matter entrusted to the discretion of the trial judge and the decision of the trial judge will not be reversed on appeal absent an abuse of that discretion. *Commonwealth v. Hude*, 500 Pa. 482, 458 A.2d 177 (1983). Evidence of another crime is admissible where the conduct at issue is so closely related that proof of one criminal act tends to prove the other. *Commonwealth v. Banks*, 513 Pa. 318, 521 A.2d 1, *cert. denied*, 484 U.S. 873, 108 S.Ct. 211, 98 L.Ed.2d 162 (1987). Such evidence is particularly relevant to prove identity. *Commonwealth v. Reid*, 533 Pa. 508, 626 A.2d 118, 119 (1993).

At issue in the second indictment was the identity of the person who shot Robert Campbell. The person who shot Robert Campbell committed the crime with a large chrome revolver, possibly a .357 Magnum. He was seen leaving the shooting wearing a lumberjack style jacket driving a dark Lincoln. Michael Havens owned a dark blue Lincoln. A man carrying a large silver gun, possibly a .357 Magnum robbed Mr. Havens of that vehicle at gunpoint. In the trunk of Mr. Havens' Lincoln was a lumberjack style jacket owned by Mr. Havens. The evidence from the robbery of Mr. Havens' vehicle was relevant to establish the identity of the person who shot Robert Campbell. Given the temporal separation and the distinct nature of the conduct at issue in the two incidents, we believe that the jury was capable of keeping the evidence separate as to each criminal act. Appellant fails to allege any specific prejudice resulting from the consolidation of the two indictments for trial. Appellant puts forth only a scant single paragraph in support of his claim, arguing a potential prejudice arising simply from the fact of consolidation itself. Arguing a potential for error is insufficient to

obtain relief; actual error affecting the outcome of the proceedings must be established. As we find no abuse of discretion in granting the motion to consolidate the two indictments for trial, and denying the motion to sever, appellant is entitled to no relief on this basis.

Appellant's next claim is that the trial court erred in refusing to suppress the identification evidence regarding Mr. Havens' selection of appellant's photograph. Appellant alleges that the identification by Mr. Havens was tainted as Mr. Havens had previously viewed appellant's likeness on television.

The reliability of a challenged identification is judged under the totality of the circumstances. *Commonwealth v. Porter*, 524 Pa. 162, 569 A.2d 942 (1990). Once an independent basis has been established for the witness's identification testimony, it is admissible. *Id.* The testimony at the suppression hearing was that Mr. Havens immediately selected appellant's photograph upon viewing the array. (N.T. 11/5/97, p. 59). There was no indication that the array itself was suggestive in any manner. The detective who presented the array to Mr. Havens was unaware that Mr. Havens had seen appellant's photograph on television until after the selection was made. (N.T. 11/5/97, p. 68). Mr. Havens did not indicate that his selection of the photo was affected by viewing appellant's likeness on television. (N.T. 11/5/97, p. 186). Appellant's likeness had been on television in relation to the efforts of the fugitive squad to effectuate his arrest as the warrant had been issued on December 31, 1996 and appellant was not apprehended until March 17, 1997. The photograph used on television was not the same photograph used in the array shown to Mr. Havens. (N.T. 11/5/97, pp. 69–70). Mr. Havens testified that when he was initially assaulted by appellant in the parking lot of the Philly's Famous Cheesesteaks there was sufficient lighting for him to observe appellant's face. During the fifteen to twenty minutes Mr. Havens was held at gunpoint in the car, appellant at all times faced Mr. Havens, and there was sufficient light inside the car for Mr.

Havens to have a good view of appellant's face. Mr. Havens was positive in his identification of appellant. (N.T. 11/5/97, pp. 186–194). There is no basis on this record to establish that Mr. Havens' identification of appellant was in any way tainted by his viewing of appellant's likeness on television prior to the photo array. This claim does not present a basis for relief.

Appellant alleges in his next claim for relief that the trial court erred in allowing the testimony of Attorney Spina. Appellant offers an undeveloped argument that the Commonwealth committed prosecutorial misconduct in forcing Mr. Spina to disclose the identity of the person who placed in his custody the .357 Magnum, which was then introduced as evidence at appellant's trial. As appellant fails to articulate the basis for his theory that it was somehow improper for the Commonwealth to procure the testimony of Mr. Spina on this point, we are at a loss as to how to respond. The doctrine of relaxed waiver will not cure the failure to present a cogent theory for relief. *See Commonwealth v. LaCava,* 542 Pa. 160, 666 A.2d 221 (1995). However, we will review the allegation of error insofar as it raises a general question as to the admissibility of the .357 Magnum obtained from Attorney Spina as relevant evidence in the prosecution of Appellant.

The admission of evidence is subject to the discretion of the trial court. *Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344 (1998). Evidence that is relevant and material to the inquiry at hand will be deemed properly admitted absent an abuse of the trial court's discretion. *Id.* The evidence at trial revealed that appellant had a gun identical in appearance to the one introduced at trial, which he pointed at Mr. Havens when forcibly taking possession of Mr. Havens' vehicle. Appellant had a gun matching the description of the one presented at the trial when he got into the car with Mr. Price after shooting Mr. Campbell. Appellant was seen in conversation with Mr. Keith Smith. At the conclusion of that conversation, Mr. Smith was in possession of a gun matching the description of the firearm seen in appellant's possession by Mr. Havens

and Mr. Price. Mr. Spina testified that Mr. Smith gave him a .357 Magnum, which Mr. Spina kept in a locked file cabinet until he was able to hand it over to the Philadelphia police. The Philadelphia police picked up the gun from Mr. Spina's office and turned it over to the crime lab. The gun was presented at appellant's trial at which point Mr. Havens identified it as being similar in appearance to the gun appellant possessed during the robbery of his vehicle. Mr. Price identified the gun as being similar in appearance to the one in appellant's possession immediately following the shooting of Mr. Campbell. Expert testimony was provided that this gun was capable of causing the fatal wound suffered by Mr. Campbell.

The circumstantial evidence connecting the gun to appellant and the criminal acts at issue was sufficient to justify admission of the firearm into evidence. There was no abuse of discretion by the trial court in admitting the testimony of Mr. Spina regarding the manner in which he came into possession of the firearm at issue. Any uncertainty that this particular gun was not the weapon used by appellant went to the weight of the evidence. *Commonwealth v. Coccioletti*, 493 Pa. 103, 425 A.2d 387 (1981). Insofar as admissibility is concerned, we discern no abuse of discretion by the trial court in allowing the testimony of Mr. Spina. Nor, given the absence of any argument on this point, can we find any evidence of prosecutorial misconduct in subpoenaing Mr. Spina to testify in this manner.

In his final claim of trial court error, which also extends into an argument in the penalty stage, appellant alleges that there was insufficient evidence to support his conviction of robbery as to Robert Campbell. Appellant argues there was no evidence that at the time Robert Campbell was shot a robbery was in progress. A robbery is committed where the perpetrator attempts to commit a theft by threatening another with serious bodily injury. 18 Pa.C.S. § 3701 (a)(1)(ii). The evidence established that appellant approached Mr. Campbell at the EXXON gasoline station. There was no evidence that appellant and Mr. Campbell were acquainted

with one another prior to the encounter at the gas station. The Johnsons, who observed the shooting, testified that Mr. Campbell's arms were raised in the air as he was falling backwards. As Mr. Campbell was falling, the Johnsons heard a gunshot. There was no evidence that anything had been removed from Mr. Campbell prior to the shooting. Mr. Campbell was armed at the time of the shooting; however, his gun was still snapped into its holster when the fatal shot was fired.

 A robbery is completed when an attempt is made to take the property of another by force or threat of force. *Commonwealth v. Thompson,* 538 Pa. 297, 648 A.2d 315 (1994). There is no requirement that the robbery be success-ful. The circumstantial evidence when viewed in the light most favorable to the Commonwealth as verdict winner, sup-ports the inference that Mr. Campbell was the victim of a robbery at the time he was shot. *Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190 (1997), *cert. denied,* 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). As we find that there was sufficient evidence to sustain the conviction for robbery of Mr. Campbell, we also find that appellant's allegation that this evidence was insufficient to permit introduction of the aggra-vating circumstance related thereto during the penalty phase is also without merit. *See* 42 Pa.C.S. § 9711(d)(6).

Appellant's remaining contentions concern the introduction of victim impact testimony in the penalty phase of his trial. Appellant challenges the constitutionality of 42 Pa.C.S. § 9711(a)(2) and (c)(2).[2] These statutory subsections allow the

---

**2.** The statutory subsections at issue read as follows:

§ **9711. Sentencing procedure for murder of the first degree**
(a) **Procedure in jury trials.—**
(2) In the sentencing hearing, evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible. Additionally, evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed. Evidence shall include matters relating to any of the aggravating or mitigating circum-stances specified in subsections (d) and (e), and information concern-ing the victim and the impact that the death of the victim has had on

introduction of victim impact testimony in the penalty phase of a capital case. Appellant raises several constitutional challenges embracing arguments under the federal and Pennsylvania constitutions. U.S. Const. amend. VIII and XIV; Pa. Const. art. 1 §§ 1, 9, 13, 26 and 28. Appellant objects to the process by which the legislature amended the statute to include victim impact testimony, the procedure by which victim impact testimony is admitted in the penalty phase and the effect of such evidence on the deliberative process in a capital case. All of the arguments raised herein were addressed by this court in *Commonwealth v. Means*, 565 Pa. 309, 773 A.2d 143 (2000),.

In *Means*, the trial court sustained the defendant's constitutional challenge to the portions of 42 Pa.C.S. §§ 9711(a)(2) and (c)(2) that permitted victim impact testimony to be introduced in the penalty phase of a capital case. After granting the defendant's motion to invalidate the statute, the lower court stayed the penalty proceedings while the Commonwealth sought immediate review of the trial court's decision in this Court. Upon a thorough consideration of the constitutional concerns raised, we found no violation of the federal or Pennsylvania constitutions and reversed the decision of the trial court. *Means*, 565 Pa. at 332, 773 A.2d at 157. Accordingly, for the reasons stated in *Means*, we deny appellant's constitutional challenges to the introduction of victim impact testimony during the penalty phase of his capital case.

Although we reject appellant's constitutional attacks on the validity of 42 Pa.C.S. § 9711(a)(2) and (c)(2), we must address

the family of the victim. Evidence of aggravating circumstances shall be limited to those circumstance specified in subsection (d).

\* \* \*

(c) **Instructions to jury.—**

(2) The court shall instruct the jury that if it finds at least one aggravating circumstance and at least one mitigating circumstance, it shall consider, in weighing the aggravating and mitigating circumstances, any evidence presented about the victim and about the impact of the murder on the victim's family. The court shall also instruct the jury on any other matter that may be just and proper under the circumstances.

As amended, 1995, October 11, P.L. 1064, No. 22 (Special Session No. 1), § 1.

his specific claims of error regarding the admission of victim impact testimony in this case. Appellant alleges that he was prejudiced by the Commonwealth's failure to provide sufficient notice of the intent to present victim impact testimony. Without sufficient notice, appellant complains that he was deprived of an opportunity to investigate the underlying basis of the proferred testimony and the credibility of the victim impact witness. Appellant urges the adoption of a rule requiring notice of the intent to present victim impact testimony prior to trial, similar to Pa.R.Crim.P. 352, regarding notice of aggravating circumstances. *See Commonwealth v. Wesley*, 562 Pa. 7, 753 A.2d 204 (2000). The Commonwealth rebuts this allegation of error as it is stated in general terms, and because appellant fails to offer any specific claims of actual prejudice.

 Although this objection as to notice was not raised before the trial court, under our doctrine of relaxed waiver, applicable only in direct appeals of capital cases, we will address the claim. *Zettlemoyer*, 454 A.2d at 942 n. 3. Adequate notice is one of the essential elements of procedural due process. *Commonwealth v. Thompson*, 444 Pa. 312, 281 A.2d 856, 858 (1971). We agree that the better practice is to require notice of the intent to introduce victim impact testimony prior to trial. A requirement of notice prior to trial enables the defendant to investigate the background of the decedent, and prepare for potential victim impact testimony prior to jury selection. Nor is it a burden for the Commonwealth to provide pretrial notice limited to a list of potential witnesses and a brief outline of their proffered testimony.

 However, addressing future procedure does not resolve the issue herein. The question of the adequacy of the notice given in the instant matter must be resolved on the record presented. The Commonwealth gave appellant notice at the conclusion of the guilt phase, on November 10, 1997, that it planned to present Robert Campbell's widow in the penalty phase as a victim impact witness. The penalty phase was scheduled to commence on November 12, 1997, as the intervening day was a court holiday. On the afternoon of

November 10, 1997, appellant moved to preclude victim impact testimony on the basis of the constitutional arguments referenced herein above. The motion was argued and denied by the trial court. The trial court directed the Commonwealth to have Mrs. Campbell's testimony reduced to writing and submitted to appellant later that day.[3] Appellant was provided with the statement at least twenty-four hours in advance of Mrs. Campbell's testimony. The trial court also reviewed the written statement prior to admitting the testimony. Appellant voiced no specific objection to the content of the victim impact statement or the manner in which the statement was presented to the jury. The statement was limited to a description of the contours of Robert Campbell's life. It provided the jury with a brief portrait of Robert Campbell as a life in being with a wife, children and grandchildren. The statement revealed the effect of Robert Campbell's death on the financial, social and emotional well being of his surviving family members. The statement was limited to relevant information about the decedent. Mrs. Campbell was sworn as a witness and read the following statement to the jury:

BY MR. SAX:

Q. Mrs. Campbell, Bob Campbell was your Husband?

A. Yes.

Q. Did you prepare a so-called victim impact statement for the jury?

A. Yes, I did.

Q. Would you please read it to be the ladies and gentlemen of the jury if you have a copy of it in front of you.

A. Yes, I do.

Q. Please read it.

3. The trial court relied heavily on the opinion of the New Jersey Supreme Court in *State v. Muhammad*, 145 N.J. 23, 678 A.2d 164 (1996) for guidance in addressing the constitutional challenges to admitting victim impact testimony and the presentation of such evidence. As we noted in *Means*, the New Jersey Supreme Court made a thorough review of this issue under its state constitution and found victim impact testimony did not violate state constitutional guarantees. *Means*, —— Pa. at ————, 773 A.2d at 149.

A. Bob Campbell was born in the Overbrook Section of Philadelphia on July 12, 1947. He was the only son of Stan and Rose Campbell. He served in the United States Army and was stationed in Korea. After his honorable discharge he started his career as an ironworker for Local 401 which lasted 24 years. In 1996 he started a new occupation as a security guard. I married Bob on June 24, 1978 and we made our home in the Overbrook section of Philadelphia.

Q. Slow down a little bit.

The Court: Go Ahead. (sic). That's all right. Go ahead. Take your time.

The Witness: We have four children and two grandchildren whom he adored. Bob was a loving husband, father, grandfather and son. Bob never hesitated to come to the aid of anyone who needed help. Bob was a fun loving guy who loved and respected life. Bob coached and organized little league baseball for the Overbrook AA for many years. He also coached for Our Lady of Lourdes Football and Basketball teams. Bob was an active town watch member and was very involved in his community. Since the death of my husband our family has been devastated. I have now become the sole provider for my family, something I have never had to do before. Our grandson Andrew who will be seven years old remembers when Grandpop taught him to hit his first baseball but Bob never had a chance to see his Grandson play in his first game. Our Granddaughter Samantha who turned two on the 4th of July will only remember her Pop Pop by the pictures we have to show her. Our youngest daughter Amanda will not have her father present at her high school graduation or have him give her away at her wedding like he did our oldest daughter Michelle. Our sons John and Ken will no longer be able to ask their father for advice or share their day-to-day experiences with Bob.

We lost a loving husband, father, grandfather and son who was always there when we needed him. We are living with a huge void in our lives. Life has not been the same without him. Gone are the big arms he would put around me and the times we would walk the dog together holding

hands. Gone are the holiday barbecues, the backgammon games, pitching horseshoes and his help when a strong hand was needed.

We are thankful for Bob Campbell's life, his courage, and diligence in the face of all odds, and for his loving of family and friends. Rest assured that Big Bob Campbell will always remain in our hearts.

Mr. Sax: Thank you. Thank you.

The Court: Any Questions?

Thank you, Mrs. Campbell, you may step down.

N.T. 11/12/97 pp. 56–59.

As stated above, appellant makes no specific claim of prejudice, presenting only a general argument that greater notice should have been provided. Appellant was formally advised of the intent to call Mrs. Campbell as a victim impact witness at 3:00 p.m. on November 10, 1997. Within a few hours of that notification appellant was provided with a written statement of Mrs. Campbell's proposed testimony. Appellant was also permitted to redact portions of the proposed testimony prior to Mrs. Campbell taking the stand. Appellant made no objection then, nor does he do so now, as to how additional time would have altered his handling of this witness. Appellant had more than twenty-four hours to discover information relevant to Mrs. Campbell's credibility and to investigate the specific information about Robert Campbell's life prior to the statement being presented to the jury. We can discern no prejudice suffered by appellant on the record presented. Accordingly, although we reject appellant's specific claim of error, we reaffirm our position that in all future cases, notice must be provided prior to trial.

Finally, appellant broadly argues that insufficient structure was provided for the jury on how to consider victim impact testimony within the deliberative process. In *Means*, we discussed this broad allegation of error and found that the absence of specific instructions on what weight should attach to victim impact testimony did not affect the constitutional balance of the sentencing scheme. *Id.*, 565 Pa. at 326, 773

A.2d at 154.[4] As we noted in *Means,* a trial judge is always free to utilize his or her own words when charging a jury. In this case the trial court gave the following instruction to the jury on the issue of victim impact testimony:

Now, when voting on the general findings, you are to regard a particular aggravating circumstance as present only if you all agree that it is present. On the other hand, each of you is free to regard a particular mitigating circumstance as present despite what the other jurors believe.

This different treatment of aggravating and mitigating circumstances is one of the law's safeguards against unjust death sentence. It gives the defendant the full benefit of

4. However, we recognized the potential victim impact testimony carries to inflame the passions of the jury. To maintain a proper balance between admitting relevant victim impact testimony and protecting the deliberative process from arbitrary and capricious influences, we suggested appropriate language for charging the jury when such testimony is admitted. We reiterate that language herein:

To further the goal of admitting relevant victim impact testimony, while eliminating the potential for impassioned emotional appeals to the jury, we recommend the following instruction be employed in cases in which victim impact testimony has been received:

The prosecution has introduced what is known as victim impact evidence. Victim impact evidence is not evidence of a statutory aggravating circumstance and it cannot be a reason by itself to impose the death penalty. The introduction of victim impact evidence does not in any way relieve the Commonwealth of its burden to prove beyond a reasonable doubt at least one aggravating circumstance. You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstances have been proven beyond a reasonable doubt independent from the victim impact evidence, and if one or more jurors has found that one or more mitigating circumstances have been established by a preponderance of the evidence. Victim impact evidence is simply another method of informing you about the nature and circumstances of the crime in question. You may consider this evidence in determining an appropriate punishment. However, the law does not deem the life of one victim more valuable than another; rather, victim impact shows that the victim, like the defendant, is a unique individual. Your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence. The sentence you impose must be in accordance with the law as I instruct you and not based on sympathy, prejudice, emotion or public opinion and not based solely on victim impact.

*Id.* ⸺ Pa. at ⸺, 773 A.2d at 159.

any mitigating circumstances. It is closely related to the burden of proof requirements. Remember, the Commonwealth must prove any aggravating circumstances beyond a reasonable doubt while the defendant only has to prove mitigating circumstance by a preponderance of the evidence.

Now, members of the jury, you have heard testimony about the victim and about the impact of the killing on the victim's family.

Victim impact is not an aggravating circumstance, may not be so considered and is not a reason to impose the death penalty. Should you find at least one aggravating circumstances and at least one mitigating circumstance, only then may you even consider this testimony and only for the very limited purpose of helping you to determine whether or not the aggravating circumstance outweigh the mitigating circumstance.

The sentence you impose must be in accordance with the law as I instruct you and not based on sympathy, prejudice, emotion, or public opinion and not based on victim impact.

N.T. 11/12/97 p. 146.

The instructions recited above provided sufficient structure for the jury to properly consider the testimony of Mrs. Campbell in relation to all other relevant information pertinent to the deliberative process in imposing sentence in this case. The jury was directed to consider victim impact testimony only if it first found at least one aggravating circumstance and one mitigating circumstance, and only to consider the information within the weighing process. The jury was directed to eliminate sympathy, prejudice, emotion and public opinion from its consideration and told that its verdict could not be based on victim impact. The instruction adequately channeled the focus of the jury on concerns appropriate to its sentencing function and away from arbitrary and capricious factors. The language employed is consistent with the prototype instruction offered in *Means*. We find no merit to this claim of error.

Finally, as is our statutory duty pursuant to 42 Pa.C.S. § 9711(h)(3)(ii), we have reviewed the sufficiency of the evidence as to each of the aggravating circumstances found, and we find sufficient evidence was presented to establish that appellant killed Mr. Campbell during ·the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); and that he had a significant history of felony convictions involving the use or threat of violence, 42 Pa.C.S. § 9711(d)(9). Further, upon review of the entire record, we are convinced that the sentence imposed was not the product of passion, prejudice, bias, or partiality. 42 Pa.C.S. § 9711(h)(3)(i).

The judgment of sentence of death is affirmed.[5]

Justice SAYLOR concurs in the result.

Justice ZAPPALA files a concurring and dissenting opinion in which Chief Justice FLAHERTY joins.

Justice NIGRO files a concurring and dissenting opinion.

ZAPPALA, Justice, concurring and dissenting.

I agree that Appellant's claims of error regarding the guilt phase of this capital case do not entitle him to relief. I disagree, however, with the affirmance of Appellant's sentence of death because victim impact evidence was unconstitutionally presented in the penalty phase of Appellant's trial. For the reasons set forth in my dissenting opinion in *Commonwealth v. Means*, I would reverse Appellant's sentence of death and remand to the common pleas court for a new penalty hearing.

Chief Justice FLAHERTY joins this concurring and dissenting opinion.

NIGRO, Justice, concurring and dissenting.

I agree with the majority's conclusion that the Commonwealth established sufficient evidence beyond a reasonable doubt to support Appellant's conviction for first-degree mur-

---

5. The Prothonotary of this Court is directed to transmit a full and complete record of the trial, sentencing hearing, and opinion of this Court to the Governor's office. 42 Pa.C.S. § 9711(i).

der. I also concur with the majority's analysis in denying Appellant's claims of trial error. However, because I do not agree with the majority's conclusions regarding the introduction of victim impact testimony in the penalty phase of Appellant's trial, I must respectfully dissent from that portion of the majority opinion affirming Appellant's sentence of death. Accordingly, I would reverse and remand this case to the trial court for a new penalty hearing.

For the reasons more fully explained in my dissenting opinion in *Commonwealth v. Means*, 565 Pa. 309, 773 A.2d 143 (2001), I believe that the statutory provisions governing victim impact evidence in the penalty phase of capital cases, 42 Pa.C.S. § 9711(a)(2) & (c)(2), violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. While I do not dispute that victim impact evidence may be relevant in sentencing capital defendants, I take issue with the circumstances and procedures under which Commonwealth juries are to consider victim impact testimony when deciding whether to impose a death sentence. Accordingly, I believe that the trial court in the instant case erred in admitting victim impact testimony and in charging the jury on the issue of victim impact evidence.

In addition, I cannot agree with the majority's conclusion that, under the specific facts of this case, Appellant received adequate notice of the Commonwealth's intent to introduce victim impact testimony at the penalty phase. The majority places great weight on the fact that *Means* was not decided at the time of Appellant's trial. I fail to see how that fact is relevant to the issue of whether Appellant's constitutional rights were violated. The majority notes that "the better practice is to require notice of the intent to introduce victim impact testimony prior to trial." Majority Opinion, 565 Pa. at 366, 773 A.2d at 178. In my view, however, prior notice is not just the better practice, but a constitutional due process requirement. The majority states that, in the future, the Commonwealth must notify a defendant prior to trial if it intends to use victim impact testimony at the penalty hearing. Inexplicably, however, the majority fails to apply that require-

ment to the instant case and baldly declares that giving Appellant "more than twenty-four hours" notice was sufficient.[1] Contrary to the majority, I do not believe that giving Appellant little more than one day's notice that the Commonwealth would be introducing victim impact testimony satisfies due process requirements, particularly in a capital sentencing proceeding where the life of the defendant hangs in the balance. Furthermore, by concluding that notice was sufficient in the instant case, the majority seriously undermines its mandate that future capital defendants must be notified prior to trial of the Commonwealth's intent to introduce victim impact evidence. Thus, I dissent from that part of the majority opinion affirming Appellant's sentence of death.

---

1. As the majority indicates, at the conclusion of the guilt phase, at 3:00 p.m. on November 10, 1997, the Commonwealth notified Appellant that it intended to present victim impact testimony in the penalty phase. The penalty phase was scheduled to commence the morning of November 12, 1997, as the intervening day was a holiday. A few hours after the conclusion of the guilt phase, the Commonwealth provided Appellant with a copy of the victim impact statement.