827 A.2d 385

COMMONWEALTH of Pennsylvania, Appellee

v.

Robert FREEMAN, Appellant.

Supreme Court of Pennsylvania.

Resubmitted Jan. 24, 2003.

Decided May 30, 2003.

Reargument Denied July 25, 2003.

538

540

Robert Brett Dunham, George Henry Newman, Philadelphia, for Appellant, Robert Freeman.

Catherine Marshall, Philadelphia, Amy Zapp, Harrisburg, for the Com. of PA.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

JUSTICE CASTILLE.

On June 18, 1998, a jury sitting in the Court of Common Pleas of Philadelphia County convicted appellant of two counts of first-degree murder,[1] and possession of an instrument of crime.[2] At the penalty hearing, the jury found one aggravating circumstance—that appellant had been convicted of another murder at the time of the current offense[3]—and no mitigating circumstances; accordingly, the jury imposed a sentence of death.[4] Trial counsel subsequently withdrew from the matter and present counsel entered the case. This direct appeal followed.

Before turning to consideration of the substantive claims raised by appellant and the substantive issues this Court independently undertakes to review in direct capital appeals, we note this Court's recent decision in *Commonwealth v. Grant*, 813 A.2d 726 (Pa.2002). *Grant* overruled the procedural rule announced in *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977), which required new counsel to

1. 18 Pa.C.S. § 2502(a).
2. 18 Pa.C.S. § 907.
3. 18 Pa.C.S. § 9711(d)(11).
4. 42 Pa.C.S. § 9711(c)(1)(iv).

raise claims of previous counsel's ineffectiveness at the first opportunity, even if that first opportunity is on direct appeal and the claims of ineffectiveness were not raised in the trial court. The new general rule announced in *Grant* is that a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." 813 A.2d at 738. The Court in *Grant* applied the new rule to the parties in that case, dismissing Grant's claims of ineffective assistance of trial counsel without prejudice to his ability to raise the claims on collateral review. *Grant* further held that its new rule applies retroactively to "any other cases on direct appeal where the issue of ineffectiveness was properly raised and preserved." *Id.*

*Grant* affects the appeal *sub judice* in two ways. First, it affects the case directly because appellant is represented by new counsel on appeal and appellant raises numerous claims sounding in the ineffective assistance of trial counsel which were not raised below. Second, *Grant* affects this case indirectly because there are a number of additional claims raised in this appeal which, though they do not sound in the alleged ineffective assistance of trial counsel, nevertheless were not raised below. These waived claims of trial court error are reviewable here, if at all, only under this Court's direct capital appeal relaxed waiver doctrine. For reasons explicated below, we believe that many of the same considerations powering our decision in *Grant* require a similar reevaluation of the viability of the capital case relaxed waiver doctrine. Although we will still employ the doctrine to reach many of appellant's waived claims in this case, we abrogate and reshape that doctrine prospectively, so as to better ensure the fair and efficient administration of criminal justice in Pennsylvania.

## I. Ineffective Assistance of Trial Counsel

■ Appellant raises eight primary claims of ineffective assistance of trial counsel involving both the guilt and penalty phases of trial.[5] None of these claims were raised below.

5. Specifically, appellant alleges that trial counsel was ineffective in: (1) failing to object to the prosecutor's repeated references that appellant

Consistently with *Grant*, we dismiss the claims without prejudice to appellant's right to pursue these claims, and any other available claims, via a petition for relief under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. § 9541 *et seq.*

## II. Relaxed Waiver

Appellant also raises nine claims of trial court error.[6] Many of these claims are waived because appellant failed to

had "executed" the two victims; (2) failing to object to a penalty phase jury charge which was defective because it (a) included written jury instructions given in lieu of proper oral instructions, (b) contained no definition of aggravating or mitigating circumstances, (c) did not include a definition of preponderance of the evidence, (d) did not inform the jurors that each must individually weigh the aggravating and mitigating circumstances, and (e) failed to include an instruction that the jury's life sentencing option was statutorily defined as life without possibility of parole; (3) failing to request an instruction that the jury could consider all evidence of appellant's mental or emotional disturbance throughout his relationship with the victim to be mitigating after the jury had requested a definition of when evidence of extreme mental and emotional disturbance must occur to be considered mitigating; (4) failing to file a motion *in limine* to preclude inflammatory, prejudicial photographs; (5) failing to object to the prosecutor's bolstering his own witnesses by having them confirm their prior consistent statements given to police detectives; (6) failing to object, at least in part, to numerous instances of inadmissible, prejudicial hearsay; (7) failing to object to the prosecutor's efforts to evoke sympathy for the victims' survivors, and to stir the passions of the jurors against appellant at both stages of trial; and (8) failing to object to the trial court's charging the jury that, because appellant and Shamsid–Din were not legally "married," voluntary manslaughter did not apply.

6. Specifically, appellant alleges that the trial court erred in: (1) admitting prejudicial photographs; (2) limiting the mitigation evidence of mental or emotional disturbance; (3) failing to instruct the sentencing jury that, if sentenced to life imprisonment, appellant would be statutorily incligible for parole; and (4) submitting written instructions to the jury in lieu of proper oral instructions. Appellant also alleges trial court error resulting from instances of uncorrected misconduct by the prosecutor involving: (1) repeatedly calling the killings "executions;" (2) asking appellant during the penalty phase whether he had previously told his account to anyone in law enforcement; (3) repeatedly demanding that appellant look at inflammatory photographs; and (4) employing improper victim-impact testimony and argument. Appellant also asserts that he is entitled to relief due to the cumulative effect of alleged prosecutorial misconduct. We note that many of appellant's claims are raised and briefed in the alternative, *i.e.*, both as claims of trial counsel ineffectiveness and as waived claims of "trial court error" or "prosecutorial misconduct" under the relaxed waiver doctrine.

raise them in the trial court. Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). *See also Commonwealth v. Robinson*, 543 Pa. 190, 670 A.2d 616, 620 (1995) (collecting cases). However, since this is a direct appeal in a capital case, consistently with this Court's long-standing precedent, we have the discretion to reach claims of trial court error which, though waived, are resolvable from the record. *Grant* was a non-capital case arising on this Court's allocatur docket, involving claims of trial counsel ineffectiveness raised for the first time on appeal; accordingly, *Grant* did not address this Court's capital appeal relaxed waiver doctrine. Nevertheless, many of the same difficulties that prompted this Court to reexamine and ultimately overrule the *Hubbard* doctrine in *Grant* are no less present when this Court considers belated claims of error at trial, raised for the first time on appeal under the capital case relaxed waiver doctrine. *Grant* held that new claims of trial counsel ineffectiveness are generally better suited for review on collateral attack. We think a similar general rule should govern consideration of claims of trial court error in capital cases that were not raised before the trial court.

*Grant* noted that, as reflected in Appellate Rule 302(a), appellate courts generally will not entertain claims raised for the first time on appeal. We explained that:

[S]uch a prohibition is preferred because the absence of a trial court opinion can pose a "substantial impediment to meaningful and effective appellate review." *See, e.g., Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306, 308 (1998). Further, appellate courts normally do not consider matters outside the record or matters that involve a consideration of facts not in evidence. *Commonwealth v. Rios*, 546 Pa. 271, 684 A.2d 1025, 1036 n. 11 (1996). Most importantly, appellate courts do not act as fact finders, since to do so "would require an assessment of the credibility of the testimony and that is clearly not our function." *See, e.g., Commonwealth v. Pierce*, 537 Pa. 514, 645 A.2d 189, 198 (1994);

*Commonwealth v. Griffin,* 511 Pa. 553, 515 A.2d 865, 869 (1986).

*Grant,* 813 A.2d at 733–34. The *Grant* Court further noted, however, that in the area of ineffectiveness claims, and under *Hubbard,* appellate courts are routinely called upon to perform each of these disfavored tasks:

> In ruling on an ineffectiveness claim, it is rare that a trial court opinion exists which will aid the appellate court in examining the claim. Appellate courts are frequently called upon to consider matters outside the record. Moreover, appellate courts often engage in some fact finding by being required to speculate as to the trial strategy of trial counsel in order to rule upon these claims.

*Id.* These difficulties "prompt[ed] us to revisit the continued validity of *Hubbard.*" *Id.* In that consideration, we noted that the general preference in the overwhelming majority of jurisdictions was to defer review of counsel ineffectiveness claims until collateral review. *Id.* We also noted the difficult task facing appellate counsel, in the wake of *Hubbard,* in attempting to uncover and develop extra-record claims of counsel ineffectiveness in the truncated time frame available on direct appeal review, a task further complicated by the fact that counsel's duty in this regard is not entirely clear, at least as a constitutional matter. *Id.* at 736 (discussing *Woods v. State,* 701 N.E.2d 1208 (Ind.1998), and *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)). Ultimately, this Court concluded that "the same concerns that animated our general approach to appellate review should apply with equal vigor in the ineffectiveness arena." *Id.* at 737, 87 S.Ct. 1396. Accordingly, we overruled *Hubbard* and adopted a new general rule which more closely conformed to Rule 302(a) and this Court's general appellate practice.

Some of the same difficulties which led to *Grant*'s overruling of *Hubbard* also arise when this Court employs relaxed waiver in capital cases to address issues of trial error not raised below.[7] This Court often is required to decide such

---

7. We emphasize that, in this discussion, we are speaking only of claims which are waived because they were not raised below, and not of more

issues without the benefit of a trial court opinion or other indication of the trial judge's view. We observed in *Grant* that "the trial court is in the best position to review claims related to trial counsel's error in the first instance as that is the court that observed first hand counsel's allegedly deficient performance." 813 A.2d at 737. This is no less true for claims of alleged trial court error—and particularly where discretionary decisions, such as the admission or exclusion of evidence, which often depend upon trial context, are involved. *See Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444, 456 (1998) ("Clearly, the trial court is in the best position to correct trial errors because it hears the objectionable matter and can promptly assess its effect on the jury in the framework of the entire trial."). Under relaxed waiver, the trial judge is eliminated from the process no less than under the *Hubbard* rule.

At the same time this Court, of necessity, is frequently obliged to consider matters outside of the record when reaching a claim under relaxed waiver. When a claim has not been raised in the trial court there is often a scant or insufficient record for appellate review. "Where parties below were not aware that a particular issue was being raised, it was quite likely that testimony germane to that issue would be overlooked or believed to be unnecessary and consequently not presented." *Commonwealth v. Mitchell*, 464 Pa. 117, 346 A.2d 48, 52 (1975). The record will be devoid of relevant, contemporaneous arguments from the trial attorneys, who were in the best position to advocate the merits of the matter when it arose—particularly with respect to the harmfulness or curability of an objectionable event, a matter which appears in a very different light before a verdict has been returned. After-the-fact reconstructions, non-record sources, and averments in appellate briefs are distinctly inferior to review of record

technical waivers also arguably encompassed by the relaxed waiver rule, such as a failure to renew a claim already preserved by contemporaneous objection, or a failure to include a preserved claim in a statement filed in response to a trial court's order under Pa.R.A.P.1925, or a failure to comply with briefing requirements on appeal.

objections, arguments, and remedial requests actually and timely forwarded and decided by the trial court.

In a similar vein, relaxed waiver practice often requires the Court to engage in speculation concerning the reasons for the trial judge's action or inaction—or, to put it more accurately, to speculate as to what the judge would have done if an objection had been made—without benefit of the jurist's actual ruling or thinking in the context of the trial as it was unfolding. Belated appellate challenges to matters such as the prosecutor's alleged misconduct—four such claims are raised by appellant here—likewise require the Court to speculate as to the reasons for a challenged question, argument or course of conduct. For example, if an objection to an allegedly improper question is timely raised, the prosecutor can be directed to state the legal ground or basis for the question on the record and the judge can then rule. Explanations proffered in after-the-fact opinions, appellate briefs, or affidavits are hardly an adequate substitute for such a contemporaneous record.

The relaxed waiver rule also presents its own unique jurisprudential problems. The doctrine obliges this Court to view many claims in an academic, artificial, or misleading fashion. For example, this Court is often asked to determine trial court error when, in point of fact, the trial court was not asked to act and thus cannot accurately or fairly be said to have made an "error." The potential for misleading review is particularly acute in instances where we examine a waived claim of "trial court error" premised upon a case or rule of constitutional law which was not even in existence at the time of trial. In such an instance, the relaxed waiver rule operates to permit an entirely new rule of law to apply retroactively to a matter in which the issue was not properly raised and preserved below. For example, the United States Supreme Court has held that the rule set forth in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), applies retroactively to matters pending on direct appeal at the time the case was decided. *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). Even when a new rule

of law is deemed to apply retroactively, however, it still applies only to matters where the question at issue was properly raised and preserved in the trial court and at all subsequent stages of the adjudication up to and including the direct appeal. *See, e.g., Commonwealth v. Tilley,* 566 Pa. 312, 780 A.2d 649, 652 (2001); *Commonwealth v. Cabeza,* 503 Pa. 228, 469 A.2d 146, 148 (1983). *See also Shea v. Louisiana,* 470 U.S. 51, 58 n. 4, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985). Nevertheless, the relaxed waiver doctrine has obliged this Court to review a *Batson* claim raised for the first time on direct appeal. *See Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846, 849–50 (1989). This was so in *Jamal,* even though the appellant was tried almost four years before *Batson* was decided, he raised no *Batson*-type objection at trial, and he did not make a factual record that would be adequate to sustain a *Batson* claim. Claims of alleged trial court "error" should not be evaluated in light of standards that did not apply at the time of trial, standards that the defendant did not urge the trial court to adopt, and which the trial court could not possibly have anticipated. As a matter of principle, it is more accurate and realistic to view claims in light of what actually happened at trial, and under the law that actually applied. Belated or collateral attacks upon what happened at trial are better suited for consideration under a different rubric, such as ineffective assistance of counsel, where the proper focus is on the reasons counsel failed to raise an issue which was never brought to the trial judge's attention at a time when remedial measures might have been undertaken.

Similarly, the uncabined availability of relaxed waiver to resurrect unpreserved claims degrades the importance of the trial itself by providing an incentive not to raise contemporaneous objections so as to build in claims for appeal. *See Brown,* 711 A.2d at 455. As this Court explained in abrogating the direct appeal fundamental error theory over a quarter century ago in *Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1974), there are multiple, salutary reasons for this Court to encourage practices by which trial judges are

given the initial opportunity to timely address claims of error, thereby ensuring prompt resolution at the most important stage of a case, and forestalling the necessity for appellate review and after-the-fact relief:

> Requiring a timely specific objection to be taken in the trial court will ensure that the trial judge has a chance to correct alleged trial errors. This opportunity to correct alleged errors at trial advances the orderly and efficient use of our judicial resources. First, appellate courts will not be required to expend time and energy reviewing points on which no trial ruling has been made. Second, the trial court may promptly correct the asserted error. With the issue properly presented, the trial court is more likely to reach a satisfactory result, thus obviating the need for appellate review on this issue. Or if a new trial is necessary, it may be granted by the trial court without subjecting both the litigants and the courts to the expense and delay inherent in appellate review. Third, appellate courts will be free to more expeditiously dispose of the issues properly preserved for appeal. Finally, the exception requirement will remove the advantage formerly enjoyed by the unprepared trial lawyer who looked to the appellate court to compensate for his trial omissions.

*Id.* at 116–17 (footnotes omitted).

In light of these difficulties with the relaxed waiver doctrine, it is worth reexamining its history, purpose, and contours to see whether there is a compelling reason to retain this broad and unique exception to the basic requirement of contemporaneous objection and issue preservation.

As this Court noted in *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693 (1998), the operating principle behind the relaxed waiver doctrine, as originally formulated, was "to prevent this court from being instrumental in an unconstitutional execution." *Id.* at 700. The doctrine has its genesis in this Court's decision in *Commonwealth v. McKenna,* 476 Pa. 428, 383 A.2d 174 (1978), and was expanded in *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). *McKen-*

*na* and *Zettlemoyer* are very different cases decided under very different statutes and circumstances.

*McKenna* was a case where this Court stepped in to prevent what would have been an unconstitutional execution. *McKenna* arose in the wake of the uncertainty generated after the United States Supreme Court issued its landmark decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which held that death penalty statutes cannot leave unbridled discretion in the sentencing body to determine whether a sentence of death should be imposed in a particular case. *See* 408 U.S. at 256–57, 92 S.Ct. 2726 (Douglas, J., concurring); *McKenna,* 383 A.2d at 177. Following *Furman,* this Court struck down the Pennsylvania death penalty statute, the Act of 1939 (18 P.S. § 4701 (repealed)), which required the jury to determine whether a sentence of death or life imprisonment was appropriate for a first-degree murder conviction, subject only to very general procedural considerations, as violative of the Eight and Fourteenth Amendments of the U.S. Constitution. *See Commonwealth v. Bradley,* 449 Pa. 19, 295 A.2d 842 (1972).

The Pennsylvania General Assembly responded to *Bradley* by enacting a death penalty statute which provided, in its entirety, as follows: "A person who has been convicted of a murder of the first degree shall be sentenced to death or to a term of life imprisonment." 18 Pa.C.S. § 1102 (subsequently amended). As the *McKenna* Court noted, the new statute obviously did not cure the *Furman*-based constitutional infirmities in the Act of 1939. Instead, it appeared to have been a stop-gap measure designed to provide some legislative authority for imposition of a capital sentence until the General Assembly could formulate a response to *Furman.* 383 A.2d at 178. McKenna nevertheless was tried under the new provision, was convicted of first-degree murder and rape, and was sentenced to death by the jury.

On appeal, this Court concluded that Section 1102 was unconstitutional and "void on its face," under *Furman* and *Bradley,* because of the totally unbridled sentencing discretion reposed in the jury. *McKenna,* 383 A.2d at 178. The Court

then turned to consideration of a more difficult question of appellate jurisprudence: whether to reach and grant relief on this obviously meritorious constitutional issue in light of the "procedural peculiarity" that McKenna, who apparently preferred a sentence of death to spending life in prison, had expressly refused to challenge Section 1102 and refused to let his lawyer do so.[8] The Court recognized that it was "elementary that issues not preserved for appellate review or, even if raised at the trial level, not raised by a party to an appeal, will not be considered by an appellate court." *Id.* at 179. Indeed, the Court noted, "the doctrine of waiver is, in our adversary system of litigation, indispensable to the orderly functioning of the judicial process." *Id.* at 180. The Court nevertheless opined that there are "occasional rare situations where an appellate court must consider the interests of society as a whole in seeing to it that justice is done, regardless of what might otherwise be the normal procedure." *Id.* The Court deemed the circumstance before it—involving the imposition of a sentence that is "irrevocable in its finality" under a patently unconstitutional sentencing scheme "clearly contrary to the express law of the land"—to be such a rare situation. Accordingly, the Court had "a duty to uphold the mandates of the constitution over the countervailing considerations of normal appellate procedure." *Id.* at 179–81; *see also id.* at 181 ("[W]here an overwhelming public interest is involved but is not addressed by the parties, this Court has a duty to transcend procedural rules which are not, in spirit, applicable, to the end that the public interest may be vindicated"). The Court proceeded to reach the issue on its own, vacated McKenna's death sentence, and remanded for resentencing on the murder conviction.

Justice (later Chief Justice) Nix concurred in the result, noting that he agreed that the legislation under which McKenna's death sentence was imposed was "unquestionably consti-

8. McKenna did actively seek a new trial, raising nine claims of trial court error, errors that this Court summarily rejected as meritless. *See id.* at 176 & n. 3, 383 A.2d 174. The constitutionality of Section 1102 was raised by the *amicus curiae*, whose standing to raise the issue was, the Court noted, open to question. *Id.* at 176–79, 383 A.2d 174.

tutionally infirm," but that he disagreed with the majority's posing the procedural issue as one of overlooking a party's waiver and failure to press a claim. *Id.* at 182 (Nix, J., concurring). In Justice Nix's view, the real question "reaches the propriety of this Court's acquiescence in an obvious excess of sentencing power of one of its inferior tribunals." *Id.* That issue was resolved by this Court's supervisory power and obligation: "Where there is an absence of sentencing power . . ., this Court's supervisory power requires that it provide a remedy, even if *sua sponte* consideration is necessary to effectuate that relief." *Id.* at 182 n. 5. *See also id.* at 183 ("In my judgment it would be repugnant to any fair system of jurisprudence to knowingly permit a court to impose a sanction (regardless of its nature) that exceeds that tribunal's authority"). Thus, Justice Nix did not view the fact that the sentence at issue was death to be the controlling factor warranting *sua sponte* review of McKenna's death sentence; indeed, to the contrary, Justice Nix, obviously cognizant of the ramifications of the decision, expressed concern that the majority's emphasis upon "the awesome nature of the penalty[ ] unnecessarily invites future requests for further relaxation of our rules in death penalty cases." *Id.* at 183.

Justice Nix's latter observation proved prescient. Although *McKenna* involved the "rare" circumstance of a defendant who intentionally refused to challenge the facially invalid death penalty statute under which he was sentenced and would have been unconstitutionally executed, the *McKenna* exception has been carried over to current capital litigation, and has been expanded exponentially so as to reach the most commonplace of waived claims.

The first case to import and expand *McKenna* was Zettlemoyer. Zettlemoyer did not involve the Court raising an issue *sua sponte* in order to prevent an unconstitutional execution. The waived claim in *Zettlemoyer* was a narrow and fact-intensive evidentiary claim: *i.e.,* that the trial court had erred in permitting the Commonwealth to read to the jury indictments filed against Zettlemoyer in another criminal proceeding. This claim was actually forwarded by Zettlemoyer, not

raised by the Court *sua sponte* against his wishes, and it was only technically waived, for having not been renewed in post-verdict motions. The basis for today's relaxed waiver doctrine is found only in footnote 19 of Justice Larsen's majority opinion. The footnote provided the following rationale for the Court's determination not to "adhere strictly to [its] normal rules of waiver" in capital appeals:

> [F]or the reasons stated in *Commonwealth v. McKenna*, 476 Pa. 428, 437–41, 383 A.2d 174 (1978), and because this Court has an independent, statutory obligation to determine whether a sentence of death was the product of passion, prejudice or some other arbitrary factor, whether the sentence is excessive or disproportionate to that imposed in similar cases, and to review the record for sufficiency of the evidence to support aggravating circumstances, we will not adhere strictly to our normal rules of waiver. **The primary reason for this limited relaxation of waiver rules is that, due to the final and irrevocable nature of the death penalty, the appellant will have no opportunity for post-conviction relief wherein he could raise, say, an assertion of ineffectiveness of counsel for failure to preserve an issue or some other reason that might qualify as an extraordinary circumstance for failure to raise an issue.** 19 P.S. § 1180–4(2). Accordingly, significant issues perceived *sua sponte* by this Court, or raised by the parties, will be addressed and, if possible from the record, resolved.

*Zettlemoyer*, 454 A.2d at 955 n. 19 (emphasis added).

Although the Court's citation to *McKenna* indicates the Court's concern with the unique severity and finality of the death penalty, the "primary reason" underlying the *Zettlemoyer* expansion of the *McKenna* exception to issue preservation was the Court's concern that death-sentenced prisoners, unlike other prisoners, had no opportunity to seek post-conviction review where they could pursue otherwise waived claims under the guise of ineffective assistance of counsel or some other theory. This concern was questionable at the time, and it is non-existent today. Justice Larsen's opinion in *Zettlemoyer* cited no authority for this concern. The concern

apparently stemmed from the very newness of the death penalty statute—whose constitutionality was first upheld in *Zettlemoyer*—and some resulting confusion as to the meaning of 42 Pa.C.S. § 9711(i), which then provided that "[w]here a sentence of death is upheld by the Supreme Court, the prothonotary of the Supreme Court shall transmit to the Governor a full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court." The concern was articulated most directly in Justice (later Chief Justice) Roberts' dissenting opinion in *Zettlemoyer*. The dissent cited Section 9711(i)'s requirement that the record be transmitted to the Governor as proof that the death sentence would foreclose the availability of collateral review. *Zettlemoyer*, 454 A.2d at 970 (Roberts, J., joined by O'Brien, C.J., dissenting).

In the very next opinion from this Court discussing the relaxed waiver rationale, however, the Court concluded that the "primary reason" for *Zettlemoyer*'s approval of its expanded version of relaxed waiver—the perceived unavailability of collateral review for death-sentenced prisoners—was "faulty." In *Commonwealth v. Travaglia*, 502 Pa. 474, 467 A.2d 288 (1983), *cert. denied sub nom. Travaglia v. Pennsylvania*, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984), the majority opinion by Justice (later Chief Justice) Zappala explained that Section 9711(i) provided only that *a* full and complete record must be forwarded to the Governor following the affirmance of a death penalty. "[T]he statute does not require that the *official* record be transmitted to the Governor. Nor does the statute in any other way, either expressly or impliedly, remove the case from the jurisdiction of the courts or prevent further action by the courts." *Travaglia*, 467 A.2d at 304 n. 5 (emphasis in original). The Court further noted that the language in *Zettlemoyer* suggesting the unavailability of post-conviction relief in capital cases, in addition to being mistaken, was *dicta*.

Despite the fact that the primary rationale for *Zettlemoyer*'s expansive view of relaxed waiver was so quickly deemed to be faulty in *Travaglia*, the relaxed waiver rule became common

in direct capital appeals and has been employed to reach a wide variety of claims. The practice is so settled that it is often explained only with a bare citation to the Zettlemoyer *dicta. E.g., Commonwealth v. Rizzuto,* 566 Pa. 40, 777 A.2d 1069, 1081 (2001); *Commonwealth v. Natividad,* 565 Pa. 348, 773 A.2d 167, 178 (2001); *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859, 874 n. 16 (2000); *Commonwealth v. Kemp,* 562 Pa. 154, 753 A.2d 1278, 1285 (2000); *Commonwealth v. Fletcher,* 561 Pa. 266, 750 A.2d 261, 270 (2000); *Commonwealth v. Carson,* 559 Pa. 460, 741 A.2d 686, 697 (1999); *Commonwealth v. Mason,* 559 Pa. 500, 741 A.2d 708, 718 n. 9 (1999); *Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31, 40 (1998); *Commonwealth v. Elliott,* 549 Pa. 132, 700 A.2d 1243, 1252 n. 21 (1997); *Commonwealth v. Speight,* 544 Pa. 451, 677 A.2d 317, 326 n. 15 (1996); *Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700, 707 n. 4 (1984).[9]

**9.** The relaxed waiver practice, however, was not absolute, but discretionary. This Court declined to invoke the doctrine in many instances, often involving situations where the failure to raise a claim below might have fallen within the realm of defense trial strategy, or when the absence of a contemporaneous objection made it difficult to resolve the issue on the record presented. *E.g., Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280, 1291 n. 14 (2000) (waived issue under *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) not subject to relaxed waiver review; trial court's obligation to issue *Simmons* charge requires defense request for charge); *Commonwealth v. Gribble,* 550 Pa. 62, 703 A.2d 426, 434–35 (1997) (suppression issue waived where defendant withdrew pre-trial motion to suppress, thereby depriving Commonwealth of opportunity to meet burden of proving that evidence was lawfully seized); *Commonwealth v. Wallace,* 522 Pa. 297, 561 A.2d 719, 725 (1989) (claim that court erred in failing to issue cautionary instruction waived where court offered to give charge and counsel failed to "take a stand" on issue and failed to object when cautionary charge was not forthcoming); *Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846, 849 (1989) (noting that Court has reached certain waived claims in capital cases but declined to reach others); *Commonwealth v. Peterkin,* 511 Pa. 299, 513 A.2d 373, 378 (1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987) (claim that two prospective jurors were improperly excluded for cause waived where trial defense counsel indicated he had no objection to challenges for cause); *Commonwealth v. Szuchon,* 506 Pa. 228, 484 A.2d 1365, 1379–80 (1984) (claim that prospective jurors were improperly excluded waived where counsel's decision not to raise claim or attempt to rehabilitate jurors must be viewed as tactical and where that decision resulted in record that made it difficult to resolve claim). Moreover,

Since *Zettlemoyer* and *Travaglia,* this Court has had extensive experience with state post-conviction review in capital cases. This experience has proven with absolute certainty that the *Travaglia* Court was correct that the fear of an absence of collateral review, the primary basis for the *Zettlemoyer* formulation of the relaxed waiver doctrine, is erroneous. Death-sentenced prisoners in Pennsylvania have an opportunity for full post-conviction review, via the PCRA, where they can, and do, pursue waived claims through assertions of ineffective assistance of trial counsel. Thus, the rationale for *Zettlemoyer*'s expansion of the rule in *McKenna* cannot justify continued application of the expansive relaxed waiver rule which exists today.

In addition to deriving from a faulty "primary" rationale, the *Zettlemoyer* relaxed waiver rule has evolved in a way not envisioned by either the *McKenna* holding or the Zettlemoyer *dicta.* Although the *Zettlemoyer* footnote certainly set the narrow *McKenna* rule adrift from its unconstitutional execution moorings, it envisioned only a "limited" relaxation of waiver rules to address "significant issues." 454 A.2d at 954 n. 19. In practice, however, the rule has become such a matter of routine that it is invoked to capture a myriad of claims, no matter how comparatively minor or routine. *See Albrecht,* 720 A.2d at 700 (adverting to "ever-widening application" of relaxed waiver doctrine). In addition, as noted, the waiver overlooked in *Zettlemoyer* was a technical one: the appellant apparently raised the claim at trial but then merely failed to renew it on post-verdict motions. The relaxed waiver practice has since been routinely employed, however, to reach claims that were not merely "technically" waived, but which in fact were not raised **at all** in the trial court. *See, e.g., Commonwealth v. Williams,* 541 Pa. 85, 660 A.2d 1316, 1319 (1995) (reaching claims under relaxed waiver despite fact that appellant's counsel "failed to object at trial to any of the errors now asserted").

this Court made clear in *Commonwealth v. Albrecht, supra,* that the practice was to have no place in capital appeals under the PCRA.

It is notable that, even when applying the rule, this Court in recent years has expressed its increasing unease and concern. Thus, the *Williams* Court admonished that the doctrine is not to be employed by counsel as a litigation tool:

This Court does not countenance trial counsel intentionally sitting by silently at trial only later to complain of trial errors on appeal after an unfavorable verdict. That a matter is a death penalty case in no way relieves trial counsel of the duty to raise appropriate contemporaneous objections at trial to allow the trial court to cure any alleged error as well as preserve issues for appellate review.

*Commonwealth v. Williams,* 541 Pa. 85, 660 A.2d 1316, 1320 (1995); *Commonwealth v. Gibson,* 547 Pa. 71, 688 A.2d 1152, 1161 n. 15 (1997) (same). In addition to warning that the doctrine was not an excuse for intentionally failing to raise trial objections, we have also warned against its abuse on appeal:

Th[e] relaxed waiver doctrine ... was never meant to serve as an invitation to appellate counsel to appear before this Court carte blanche and expect that we will resolve a litany of newly developed challenges not raised or objected to before the lower court. Clearly, such a practice would undermine the process of meaningful appellate review, which is fundamentally based on the official record of what happened at trial.

*Commonwealth v. O'Donnell,* 559 Pa. 320, 740 A.2d 198, 204 (1999). In *Commonwealth v. Brown,* 551 Pa. 465, 711 A.2d 444 (1998), we further noted that we shared the concerns advanced by the Commonwealth in that case that the doctrine " 'sabotages' the trial court's efforts to correct errors" and "encourages defense attorneys to withhold objections during trial for tactical reasons, and by that create an error upon which this Court may later grant relief." *Id.* at 455.

We are also troubled by the potential equal protection implications arising from the near-indiscriminate availability of relaxed waiver to invigorate claims never pursued below. Assume a joint capital trial of two defendants, each convicted of first-degree murder, but one receives a sentence of life

imprisonment while the other receives the death penalty. Upon their appeals, these appellants perceive an identical claim, which both failed to raise below. If it is a claim premised upon a new constitutional rule that came into existence after the trial, the life-sentenced appellant will not be able to pursue it at all in the Superior Court, while the capital appellant will receive review in this Court and, possibly, relief. Even if it is not a claim based upon a new rule, the capital appellant will have the much easier road of having his claim reviewed as if it were a preserved claim of trial error (even though it was not), subject to a mere showing of error and harmfulness, while the otherwise identically-situated life-sentenced appellant will be required to make the more difficult showing required under the three-part standard applicable to ineffective assistance of counsel. *Commonwealth v. Howard,* 538 Pa. 86, 645 A.2d 1300, 1307 (1994). Since the claims subject to capital case relaxed waiver are not limited to the penalty phase, the fact of the death sentence cannot rationally justify such a preferential, substantive treatment of a claim available to otherwise identically-situated defendants.

In light of these multiple concerns, and the unquestionable availability of the PCRA as a vehicle to consider waived claims of trial court error through the guise of claims of trial counsel ineffectiveness, we are convinced that the time has come to return the relaxed waiver doctrine to its roots in *McKenna.* Having created the rule, this Court is certainly empowered to modify or eliminate the doctrine if jurisprudential concerns warrant a change from our current practice. *See Grant, supra; Albrecht, supra; Dilliplaine, supra.*

We hold that, as a general rule on capital direct appeals, claims that were not properly raised and preserved in the trial court are waived and unreviewable. Such claims may be pursued under the PCRA, as claims sounding in trial counsel's ineffectiveness or, if applicable, a statutory exception to the PCRA's waiver provision. This general rule, like the rule announced in *Commonwealth v. Grant,* reaffirms this Court's general approach to the requirements of issue preservation. Since *Zettlemoyer,* and despite *Travaglia,* an assump-

tion has arisen that all waived claims are available for review in the first instance on direct appeal. The general rule shall now be that they are not. In adopting the new rule, we do not foreclose the possibility that a capital appellant may be able to describe why a particular waived claim is of such primary constitutional magnitude that it should be reached on appeal. Indeed, nothing we say today shall be construed as calling into question the bedrock principles that animated our decision in *McKenna* concerning the necessity of reaching fundamental and plainly meritorious constitutional issues irrespective, even, of the litigation preferences of the parties. Consistently with our approach in *Grant*, however, we leave the specific articulation of any future exception to the actual case or controversy in which that "rare" claim arises. *See* 813 A.2d at 738 n. 14.

In reformulating this Court's approach to claims not raised below, we have not lost sight of the undeniable fact that a death penalty appeal is different in quality and kind because of the final and irrevocable nature of the penalty. But our abrogation of relaxed waiver does not eliminate or diminish other substantial safeguards, put into place after *McKenna*, which already serve "to prevent this [C]ourt from being instrumental in an unconstitutional execution." *Albrecht*, 720 A.2d at 700. These protections, not available in other criminal matters, serve a function similar to the relaxed waiver rule. First, this Court performs a self-imposed duty to review the sufficiency of the evidence underlying the first-degree murder conviction in all capital direct appeals, regardless of whether the appellant has raised the issue. *See Zettlemoyer*, 454 A.2d at 942 n. 3. The Court is also required to conduct a statutory review of the death sentence itself to determine whether it was the product of passion, prejudice or any other arbitrary factor, and to determine whether the evidence adduced at trial was sufficient to support the aggravating circumstance(s) found by the jury. 42 Pa.C.S. § 9711(h)(3). This mandated review of the sentence is similar to the review this Court employed *sua sponte* in *McKenna*. In addition to these special protections afforded capital appellants, the PCRA exists for them, as for other criminal defen-

dants, as a vehicle for a full and fair, counseled proceeding through which they may challenge the stewardship of trial counsel and pursue other appropriate collateral claims.

This new general rule will be applied prospectively, beginning with those capital direct appeals in which the appellant's brief has not yet been filed in this Court, and is not due for thirty days or more after today's decision. It will then apply to all future capital appeals. In declining to apply the new approach to pending cases already briefed or in the process of being briefed, we emphasize the different posture of these cases *vis a vis* Grant, where this Court held that the new rule would apply to other cases on direct appeal where the issue of ineffectiveness was properly raised and preserved. The *Grant* rule simply deferred consideration of claims of counsel ineffectiveness to the more appropriate vehicle provided by PCRA review. Here, in contrast, the waived claims of trial error that will no longer be reached via the relaxed waiver rule are not simply being deferred to PCRA review. Instead, those waived claims would be available on PCRA review only as distinct claims of counsel ineffectiveness or under some other theory. Prospective application of our new approach will avoid upsetting the expectations of capital appellants and their direct appeal counsel who have already briefed, or are in the process of briefing, their appeals in reliance upon the prospect that this Court, in its discretion, might reach the merits of some of their otherwise waived claims of trial error. In addition, prospective application is consistent with this Court's general practice when new procedural rules of non-constitutional dimension are at issue. *E.g., Chalkey v. Roush,* 569 Pa. 462, 805 A.2d 491, 497 (2002); *Commonwealth v. Gravely,* 486 Pa. 194, 404 A.2d 1296, 1298 (1979). *See also Commonwealth v. Minarik,* 493 Pa. 573, 427 A.2d 623, 626 (1981) (plurality opinion) ("Court-made rules of procedure do not generally apply retroactively: when the circumstance motivating a new rule 'is not one of constitutional proportions, a rule will be wholly prospective' ") (quoting *Commonwealth v. Milliken,* 450 Pa. 310, 300 A.2d 78, 81 (1973)). Since this Court has long emphasized that the relaxed waiver rule did not exist to

permit capital defendants and their counsel to deliberately avoid raising contemporaneous objections, there is no ground upon which to further defer application of the new rule.

In accordance with the foregoing, we now proceed to consideration of appellant's claims upon appeal, as well as the issues this Court must otherwise review.

### III. Sufficiency of the Evidence

Although appellant has not challenged the sufficiency of the evidence underlying his first-degree murder convictions, as noted above, this Court performs a self-imposed duty to review the sufficiency of that evidence in capital cases. *See Zettlemoyer*, 454 A.2d at 942 n. 3. In reviewing the sufficiency of the evidence, the Court must determine whether the evidence admitted at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, supports the jury's finding of all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000) (citing *Commonwealth v. Rhodes*, 510 Pa. 537, 510 A.2d 1217, 1218 (1986)). "Evidence is sufficient to sustain a conviction of first-degree murder where the Commonwealth establishes that the defendant acted with the specific intent to kill, that a human being was unlawfully killed, that the person accused did the killing, and that the killing was done with premeditation or deliberation." *Spotz*, 759 A.2d at 1283 (citing 18 Pa.C.S. § 2502(d) and *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624, 626 (1991)). Specific intent to kill can be inferred from the use of a deadly weapon upon a vital part of the body. *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 267 (2000).

The evidence presented at trial established that appellant had an intermittent, romantic relationship with Mamie Shamsid–Din over the course of many years. Although they were never married and never lived together, appellant and Shamsid–Din had a child together, Denise Dillard, who was approximately twenty-one years old at the time of the murders. Their relationship was, by all accounts, tempestuous. Testi-

mony was presented that appellant beat Shamsid–Din. Appellant also frequently stalked her; he would follow her in his car, ride by her place of work, and wait outside of places where he knew she could be located. During the last year of her life, Shamsid–Din took steps to avoid contact with appellant, including entering her place of work by a side entrance, changing her work hours and, on several occasions, not reporting to work at all.

Approximately six months prior to the murders, Shamsid–Din began a romantic relationship with Dalton Johnson, and she eventually moved into Johnson's home in Ambler, Pennsylvania. On September 6, 1989, Johnson was dropping Shamsid–Din off at her place of work at 52nd and Chestnut Streets in Philadelphia, when appellant suddenly appeared at the driver's side window of Johnson's car and began beating him in the face and body with his fists. Johnson, who was immobilized by his seatbelt during the attack, sustained cuts and bruises and required hospitalization. Appellant was arrested at the scene and was ultimately charged with aggravated assault.

On September 21, 1989, appellant rented two cars from two separate rental car companies. Later that morning, he appeared at the main office of his employer and requested his paycheck, which was generally delivered to the worksite. At approximately 2:00 p.m. that same day, appellant met with his daughter, Dillard, who noticed that appellant had a large amount of cash in his possession—approximately $5,300—and two rental car keys. Appellant admitted to his daughter that he had beaten Johnson and told her that he would have killed him if Johnson had gotten out of his car. In addition, appellant told Dillard that he was not going to let Johnson take his "wife" and that he was going to kill him. He also told his daughter that she would not be seeing him for a long time.

The next day, September 22, 1989, appellant appeared outside Mamie Shamsid–Din's office in one of the rental cars that he had rented the day before. When Johnson and Shamsid–Din drove up, appellant walked up to their car armed with a loaded shotgun and shot Johnson once in the head. He

then turned the gun on Shamsid–Din and shot her in the face at least once. The victims died almost instantaneously. Appellant then got into his rental car and fled the jurisdiction. Almost seven years later, on August 22, 1996, police apprehended appellant at his brother's home in Washington, D.C. As police took him into custody, appellant told his brother that he would get the gas chamber for killing two people. At trial, several eyewitnesses identified appellant as the shooter.

The foregoing evidence overwhelmingly supports the jury's finding that Mamie Shamsid–Din and Dalton Johnson were unlawfully killed, that appellant committed the killings, that he acted with the specific intent to kill when he shot both victims in the head at close range with a shotgun, and that the killings were done with premeditation and deliberation.

## IV. Merits Review of Claims of Trial Court Error

Appellant raises four claims of trial court error at the guilt and penalty phases. Appellant first claims that the trial court erred in permitting the prosecution to introduce and show to the jury during the guilt phase black-and-white police photographs depicting the dead bodies of the victims and other aspects of the crime scene. The admissibility of these photographs falls within the sound discretion of the trial court and only an abuse of that discretion will constitute reversible error. *Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 726 (1998) (citing *Commonwealth v. Buehl*, 510 Pa. 363, 508 A.2d 1167, 1181 (1986)). The admissibility of photographs is governed by a two-step analysis. First, the trial court must determine whether a photograph is inflammatory by its very nature. Then, if the photograph is deemed inflammatory, the court must determine whether the essential evidentiary value of the photograph outweighs the likelihood that the photograph will improperly inflame the minds and passions of the jury. *Baez*, 720 A.2d at 726 (citing *Commonwealth v. Marshall*, 537 Pa. 336, 643 A.2d 1070, 1075 (1994)).

Based upon our own independent review of the photographs admitted at trial, we do not believe that this evidence was especially inflammatory. A limited number of photographs

admitted into evidence actually depict the victims' bodies, and in these their wounds are either partially or totally obscured. If anything, the black-and-white format of the photographs understate the true nature of the crime. In light of the fact that these photographs were probative concerning the element of specific intent to kill, *see Commonwealth v. Brown,* 551 Pa. 465, 711 A.2d 444, 453 (1998), we cannot conclude that the trial court abused its discretion in determining that the evidentiary value of these photographs outweighed any possible prejudicial effect.

Furthermore, the record reveals that when the Commonwealth first attempted to introduce photographs of the crime scene, trial counsel objected, whereupon the trial judge recessed the court and directed the parties to review the photographs to see if they could reach an agreement regarding the photographs which would be admitted. N.T. 6/12/98, at 79–80. During the recess, defense counsel identified those photographs he considered objectionable and the Commonwealth did not offer those into evidence. N.T. 6/15/98, at 64. There cannot have been trial court evidentiary error where the parties agreed as to which photographs were to be admitted. *See Baez,* 720 A.2d at 727 (no error in admitting videotape of murder victim's body where prosecutor and defense counsel participated in redaction of tape). Accordingly, this claim fails.

Appellant next argues that the trial court improperly instructed the jury during the penalty phase regarding the potential mitigating factor of extreme mental or emotional disturbance, 42 Pa.C.S. § 9711(e)(2) ("The defendant was under the influence of extreme mental or emotional disturbance."). During its penalty phase deliberations, the jury submitted a written question to the trial court as follows: "Define extreme mental or emotional disturbance and are we to apply said disturbance at the time of the crime or throughout the relationship?" N.T. 6/19/98, at 2. Thereupon, the trial judge met with counsel from both sides in his chambers to discuss how to answer the question. After the parties and

trial court reached an agreement on how to respond to the query, the trial court instructed the jury as follows:

> Counsel and I have met in chambers and we have discussed [the question] and this is what we agree. If you find there is evidence of a defendant's mental state, then that term extreme mental or emotional disturbance means beyond normal, a high degree of mental stress at the highest point. It is more than a minor irritation or vexation. It is a severe mental disappointment. It is that kind of stress, anger, rage, passion or agitation which, while not providing the legal excuse or justification, would be a factor in considering whether the killing was a coolly calculated killing or the shooting was as a result of the severe mental state of the defendant at that time.
>
> The term extreme mental or emotional distress applies only to the time of the crime and it must have been a factor at the time of the shooting.
>
> In addition, the extreme mental or emotional disturbance may be considered as any other reasonable evidence of mitigation as it may concern the circumstances surrounding the offense.

N.T. 6/19/98, at 2–3. Appellant did not object to this charge.

Although appellant agreed that the above charge was the appropriate response at the time of trial, he now claims, for various reasons, that the charge was erroneous. We cannot reach this claim, even under the relaxed waiver doctrine. This is not a mere technical waiver. Rather, the subject of this objection was a matter that was specifically discussed by the parties with the trial judge, resulting in an agreement on how to respond. Consistent with our prior precedents in such an instance, where the issue was joined below and appellant agreed to its resolution, we will not review the claim. *See Commonwealth v. Wallace*, 522 Pa. 297, 561 A.2d 719, 725 (1989); *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373, 378 (1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987).

 Appellant next claims that the trial court erred in failing to instruct the jury at the penalty phase that, if it chose to sentence him to life imprisonment, appellant "would be statutorily ineligible for parole." Brief of Appellant at 37. Appellant alleges that the court's failure to provide such an instruction violated his due process rights under *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In addition, appellant contends that the trial court's failure to provide a life without parole instruction violated the due process proscription against sentences imposed under a material misapprehension of law or fact, that it arbitrarily denied appellant's due process right to be sentenced by a jury exercising discretion between the statutorily prescribed options of life without possibility of parole and death, that it unconstitutionally deprived the jury of accurate sentencing information, and that it violated the requirement under the Eighth Amendment of the U.S. Constitution that a capital sentencing jury be permitted to consider and give effect to all relevant mitigating evidence.

 This is another waived claim not subject to accurate review under relaxed waiver. *See Spotz,* 759 A.2d at 1291. An instruction defining what a life sentence means in Pennsylvania is required only where the prosecution makes the defendant's future dangerousness an issue in the case and the defendant specifically requests such an instruction. *See Commonwealth v. Chandler,* 554 Pa. 401, 721 A.2d 1040, 1046 (1998); *Commonwealth v. Smith,* 544 Pa. 219, 675 A.2d 1221, 1232 (1996).[10] Here, neither of these required predicates was met. As appellant concedes, the Commonwealth did not argue future dangerousness and appellant never requested a "life means life" charge. *See* Brief of Appellant at 39 n. 20, 41–42. Therefore, the trial court did not "err" in failing to issue the charge. *Spotz,* 759 A.2d at 1291.

10. A minority of Justices on this Court has consistently expressed the view that they would require a *Simmons* instruction in every case. *See, e.g., Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344 (1998) (former Chief Justice Flaherty, dissenting; former Justice Zappala, concurring); *Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31 (1998) (former Justice Zappala, concurring; Nigro, J., concurring).

■ Appellant next contends that the trial court erred in supposedly submitting written instructions to the jury in lieu of proper oral instructions. Specifically, appellant contends that the trial court's submission of written instructions to the jury "clearly violated" this Court's decision in *Commonwealth v. Karaffa*, 551 Pa. 173, 709 A.2d 887, 890 (1998) (submission of written jury instructions on unlawful restraint and reasonable doubt in prosecution arising from rape was reversible error). Appellant argues that the trial court error here was even more "egregious[ ]" because "the court gave no *oral* instructions to the jury as to how to arrive at a verdict." Brief of Appellant at 45 (emphasis in original). This argument blatantly mischaracterizes what actually occurred at the sentencing hearing.

The record reflects that, at the close of the sentencing phase, a sentencing verdict form was handed out to each member of the jury while the jury was still in the jury box. As this occurred, the trial court instructed the jury as follows:

Members of the jury, we're now going to hand you a blank form with instructions on it that's going to be similar to that which you'll take with you in the jury room. I want you to open the instructions and read it [sic] to yourself, and after you all read it, look up. When I see all of your faces looking up, I will then give you formal instructions.

N.T. 6/18/1998, at 90. After a pause, the trial court continued:

The record reveals that each of the jurors have [sic] read the verdict slip instructions. When you go back to the jury room, if you need to refer to those instructions, you will have them with you on the formal verdict sheet. You will be given two separate verdict sheets, one for each victim because you've convicted the defendant of two separate counts of murder and, therefore, the jury must sentence him on each count individually. Don't write anything on the verdict sheet until you finished your deliberations and all have agreed on the sentence. The only reason for the verdict slip is to record your sentencing.

*Id.* at 90–91. Thus, contrary to appellant's assertions, the record clearly reveals that written jury instructions were not given to the jury; rather, the trial court merely submitted to the jury copies of the sentencing verdict slips that would be furnished to them when they retired to deliberate appellant's sentence in accordance with the Pennsylvania Rules of Criminal Procedure. *See* Pa.R.Crim.P. 357 ("In all cases in which the sentencing proceeding is conducted before a jury, the judge shall furnish the jury with a jury sentencing verdict slip . . . .") (renumbered Pa.R.Crim.P. 806 and amended, effective April 1, 2001). The verdict slip used by the trial court, which is part of the record before this Court on appeal, was identical to the form mandated by Pa.R.Crim.P. 357A (renumbered Pa.R.Crim.P. 807 and amended, effective April 1, 2001). The slip provided no instructions regarding legal issues, nor did it instruct the jury to conduct its deliberations in any particular manner. We perceive nothing improper about the procedure employed by the trial court here. *See Commonwealth v. Kemp*, 562 Pa. 154, 753 A.2d 1278, 1287–88 (2000) (virtually identical procedure followed in capital case tried before same trial judge was not improper).

Appellant's additional assertion that the trial court relied exclusively on the sentencing verdict slip and failed to orally instruct the jury at the penalty phase is meritless. To the contrary, the trial court issued extensive oral instructions on penalty phase deliberations at the beginning of the penalty phase, N.T. 6/18/1998, at 3–5, after the Commonwealth and appellant had completed their evidentiary presentations, *id.* at 73–75, and again at the close of the sentencing hearing. *Id.* at 91–94. These extensive instructions demonstrate that appellant's assertion that the trial court failed to orally instruct the jury at the penalty hearing is baseless.

■■■ Appellant next raises five allegations of prosecutorial misconduct during the guilt and penalty phases. Appellant first argues that the prosecutor's repeated use of the word "execution," or variations thereof, in reference to the murders during the penalty phase so inflamed the jury that it could not render a fair and impartial sentence. The prosecutor first

used the term "execution" during his cross-examination of one of appellant's character witnesses, John Foye:

**Prosecutor:** Let me ask you this, Mr. Foye. When did you become aware of the fact that Miss Shamsid–Din had been executed or murdered?

**Counsel:** Objection, Your Honor.

**The Court:** Objection sustained. That's an improper formation. We will not permit that to occur. That's prosecutorial discretion, but I'm telling the jury disregard that.

**Counsel:** I have a motion, which, of course, you will deny.

**The Court:** Motion denied.

N.T. 6/18/98, 17–18. Later, during the prosecutor's cross-examination of appellant, the following exchange occurred:

**Prosecutor:** You drove her to work the morning [of] the date that you executed, shot and killed Miss Mamie?

**Counsel:** Objection, Your Honor.

**The Court:** The word "execute" does not belong in this case.

*Id.* at 58. Then, during his closing argument to the jury at the penalty phase, the prosecutor made multiple references to the murders as "executions." *See id.* at 78–80. Trial counsel, however, made no objection to the use of the word in summation.

 It is well-settled that, during the penalty phase, where the presumption of innocence no longer applies, a prosecutor is afforded reasonable latitude and may properly comment on the evidence with oratorical flair. *Commonwealth v. Jones,* 546 Pa. 161, 683 A.2d 1181, 1202–03 (1996); *Commonwealth v. Young,* 536 Pa. 57, 637 A.2d 1313, 1323 (1993); *Commonwealth v. Basemore,* 525 Pa. 512, 582 A.2d 861, 869 (1990). "[C]omments by a prosecutor do not constitute reversible error unless their unavoidable effect was to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true penalty determination." *Commonwealth v. Johnson,* 542 Pa. 384, 668 A.2d 97, 107 (1995), *cert. denied,* 519 U.S. 827, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996).

Evidence presented at trial indicated that appellant told his daughter that he was not going to let Dalton Johnson take Mamie Shamsid–Din away from him and that he was going to kill Johnson. True to his word, the next day, appellant, armed with a high-powered, pump-action shotgun, approached Johnson and Shamsid–Din as they sat in Johnson's car. Without provocation, he immediately shot Johnson once in the head and then turned the gun on Shamsid–Din and shot her in the face at least once. The victims died almost instantly. Given these facts, characterization of the killings as "executions" was neither inaccurate nor particularly prejudicial. *See Jones,* 683 A.2d at 1203 (statement during closing argument at penalty phase that appellant acted as "the executioner, as the judge and the jury" was permissible); *Basemore,* 582 A.2d at 869 (prosecutor's remark that murder was a "well thought out, carefully planned, execution" was perfectly innocuous); *Commonwealth v. Marshall,* 523 Pa. 556, 568 A.2d 590, 598 (1989) (prosecutor's closing reference to appellant as a "systematic, brutal, calculating killer" was justifiable response to the defense argument that appellant was less culpable due to mental deficiencies); *Commonwealth v. D'Amato,* 514 Pa. 471, 526 A.2d 300, 313 (1987) (prosecutor's characterizations of appellant as "clever, calculating and cunning executioner" did not unavoidably prejudice appellant so that jury could not weigh the evidence properly and render true verdict).

Furthermore, the trial court sustained appellant's objections to the prosecutor's use of the term "execution" during his cross-examinations of Mr. Foye and appellant, instructing the jury that the word did not belong in the case and to disregard the prosecutor's use of it. The jury is presumed to have followed the court's instructions. *Commonwealth v. LaCava,* 542 Pa. 160, 666 A.2d 221, 228 (1995). Thus, any improper prejudice that may have arisen from the prosecutor's use of the word during cross-examination of defense witnesses was adequately cured by the trial court's instructions. *See Commonwealth v. Carter,* 537 Pa. 233, 643 A.2d 61, 77 (1994) (trial court instruction to jury not to consider prosecutor's statements as evidence cured any preju-

dice which may have been caused by comments). The comments during the penalty hearing argument were not improper. Therefore, this claim fails.

Next, appellant argues that, during the prosecutor's cross-examination of appellant in the penalty phase, the prosecutor improperly questioned appellant regarding his failure to tell the police that Dalton Johnson had previously attacked him with an ice pick in contravention of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (post-*Miranda*[11] silence is "insolubly ambiguous" and cannot be used at trial for impeachment purposes). On direct examination, appellant had testified that he had no intention of shooting Johnson and Shamsid–Din but, instead, shot both victims in the head by accident. On cross-examination, the prosecutor asked appellant to explain why, if he had not intended to kill the victims, he had approached them carrying a loaded shotgun. Appellant responded that, "I didn't know what Mr. Johnson might have had in his car because that same day [referring to approximately two weeks earlier when appellant had beaten Johnson] the police didn't write it up, but he [Johnson] came at me with an ice pick right in front of the police officer." N.T. 6/18/1998, at 68. The prosecutor responded to this explanation by asking if appellant had ever told any member of law enforcement that Johnson came after him. Appellant objected on the ground that he had an absolute right not to testify. The trial court permitted the question. Appellant responded that there was no reason for him to tell the police about the ice pick incident because the police had witnessed the attack themselves.

The Commonwealth defends the trial court's ruling by arguing that an accused's right against self-incrimination has no application to the penalty phase of a capital trial, citing decisions from this Court which indeed support that proposition. *See Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078, 1089 (1993) ("The privilege against self incrimination has no direct application to a determination of the proper sentence

11. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

to be imposed because the presumption of innocence which accompanies the accused throughout the proceedings to determine his guilt has no direct application to the sentencing determination."); *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288, 300 (1983) ("[T]he privilege against self-incrimination in its pure form has no direct application to a determination of the proper sentence to be imposed; the purpose of the prosecutor is not to 'incriminate,' and the goal of the guilty defendant is not to avoid 'incrimination.' "), *cert denied sub nom., Travaglia v. Pennsylvania,* 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984). *Accord Commonwealth v. Rice,* 568 Pa. 182, 795 A.2d 340, 358 (2002) (opinion announcing judgment of court) ("the sentencing phase of trial has a different purpose than the guilt determination phase, and ... the privilege against self-incrimination ... ha[s] no direct application to the latter phase"); *Commonwealth v. Lester,* 554 Pa. 644, 722 A.2d 997, 1009 (1998) (same); *Commonwealth v. Holland,* 518 Pa. 405, 543 A.2d 1068, 1077 (1988) (same).

Notwithstanding the line of authority from this Court relied upon by the Commonwealth, it appears that the United States Supreme Court—the ultimate authority on Fifth Amendment questions—has indicated that the constitutional privilege does apply to the penalty phase of capital trials. *See Estelle v. Smith,* 451 U.S. 454, 462–63, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) ("We can discern no basis to distinguish between the guilt and penalty phases of [a] capital murder trial so far as the protection of the Fifth Amendment privilege is concerned."); *see also Mitchell v. United States,* 526 U.S. 314, 325, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) ("Where a sentence has yet to be imposed ... this Court has already rejected the proposition that 'incrimination is complete once guilt has been adjudicated' ") (quoting *Estelle,* 451 U.S. at 462, 101 S.Ct. 1866). In light of *Estelle,* this questioning, which encompassed post-*Miranda* silence, should not have been permitted below.[12] We are satisfied, however, that its admission was constitutionally harmless.

12. Appellant did not cite *Estelle* to the trial court or, indeed, to this Court. Since our abrogation of the relaxed waiver rule is prospective only, however, we reach the federal claim under this doctrine.

"Harmless error exists where (1) the error did not prejudice the defendant or the prejudice was de minimus; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Commonwealth v. Hutchinson*, 571 Pa. 45, 811 A.2d 556, 561 (2002) (quoting *Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344, 350 (1999)). First, appellant explained to the jury his failure to tell police about the ice pick, and the prosecutor did not call any officers in rebuttal to contradict that explanation. Moreover, the prosecutor's line of questioning here merely sought to challenge the plausibility of appellant's direct examination testimony that he had shot the victims by accident. This testimony, however, was implausible on its face. In view of the overwhelming evidence of premeditation, deliberation, and specific intent to kill—including the fact that on the day before the murders appellant rented two rental cars, had a large amount of cash on his person, and told his daughter that he was going to kill Johnson and that she would rot be seeing him for a while, as well as the fact that he shot each of the two victims in the head at close range with a pump-action shotgun—appellant's assertions, offered for the first time in the penalty phase, that the shootings were mere accidents strained credulity. In this regard, it is notable that appellant's trial counsel essentially conceded the implausibility of appellant's "accident" account in his closing argument at the penalty phase:

A person comes before you and has done a brutal, terrible, vicious, inexcusable act and must live with that. That person is desperate. That person is remorseful. That person is scared and that person doesn't want to face up to it. Mr. Freeman never wanted to face up to this. I'm not saying to you he's still not quite facing up to this. He has to live with this, so he comes across to you with what [the prosecutor] calls a pathetic lie. It's not a lie. It's how we

have—it's our mechanism of coping [with] what has been done.

N.T. 6/18/1998, at 85–86. In light of the admitted inherent implausibility of appellant's version of events, it is highly unlikely that the prosecutor's question, which sought to underscore the incredibility of the claim, played any role in the jury's decision to return a sentence of death.

Appellant next argues that the prosecutor committed misconduct when, during cross-examination of appellant at the penalty phase, he asked appellant to view photographs of the crime scene and, when appellant refused, left the photographs next to appellant. The record reflects that the prosecutor asked appellant to explain his claim on direct examination that the shootings were an accident. Appellant responded that when he approached the victims' car he had no intention of shooting anyone. He further testified that he asked Mamie Shamsid–Din to exit the car and pointed his gun into the car. According to appellant, Dalton Johnson grabbed the gun, but appellant was able to pull it back at which point it simply "went off." The prosecutor then asked appellant how many times the gun "went off," and appellant replied that he did not remember. At that point, with the trial court's permission, the prosecutor approached appellant and attempted to show him the crime scene photographs so that appellant could "see what [he] did that day." Appellant refused and the trial court ruled that he did not have to view the pictures. When the prosecutor continued to attempt to establish whether appellant could remember how many times he had fired the gun, trial counsel interjected and requested that the pictures, which the prosecutor apparently had left at the bar of the courtroom near appellant, be taken away. The prosecutor apologized and removed the pictures, adding that he knew they were "difficult to look at." The trial court immediately cautioned the prosecutor that it wanted questions, not speeches, and that he could argue to the jury later. See N.T. 6/18/1998, at 60–62.

Appellant now characterizes this incident as "deliberate theatrics" by the prosecutor which were calculated to inflame the passions of the jury. Brief of Appellant at 18. No

relief is due. The prosecutor complied with counsel's request and, when he made a comment while doing so, the trial court interceded and corrected the prosecutor. Appellant sought no further relief. Furthermore, there is nothing improper about a prosecutor attempting to show a witness properly admitted photographs of a crime scene, particularly where, as here, the prosecutor does so in an effort to aid the witness's claimed inability to remember central details, and the exhibits call that testimony into question. Nor is a new penalty hearing warranted merely because the prosecutor temporarily left these photographs on the bar. As appellant himself notes elsewhere in his brief, *see* Brief of Appellant at 30, these photographs had previously been circulated to the jury during the guilt phase and there is no evidence that the jury even noticed them during the penalty phase. *See Commonwealth v. Gease*, 548 Pa. 165, 696 A.2d 130, 133–36 (1997) (no relief due on claim that prosecutor improperly placed poster board with crime scene photographs affixed to it within view of jury for approximately one hour where photographs had previously been admitted into evidence, jury indicated that it had not been prejudiced by viewing photographs, and trial court cautioned jury that it should not allow photographs to distort its judgment).

 In his penultimate claim of prosecutorial misconduct, appellant alleges that the Commonwealth improperly introduced victim-impact evidence and argument at several different points during both the guilt and penalty phases of his trial. Appellant first asserts that the prosecutor improperly interjected victim-impact evidence into the case during the following portion of his closing argument in the guilt phase:

Thank you, Mr. Freeman, as [defense] counsel pointed out, [Mr. Johnson] didn't suffer. Thanks a lot. Thanks a lot he didn't suffer. That's just dandy. Well, there's a courtroom of people who have suffered as a result of his actions. He pulled that trigger.

Now, ladies and gentlemen, let there be no mistake. Counsel talked about the pull that is necessary for a shotgun. Sure, after you shoot a gun like this, you're absolutely going

to have some pull back. So what does he do? He's got to reload this thing. I mean, he's got to cock it again. And Dr. Mirchandani told us, ladies and gentlemen, that he only saw two shots, a two-inch hole to the left cheek of Dalton Johnson and we know and, ladies and gentlemen, I don't mean to go over this stuff unnecessarily, and I apologize if I'm upsetting anybody, but this is my last chance to speak and these—this family—family members have waited nearly a decade, okay.

**Counsel:** Objection, Your Honor.

**Prosecutor:** A decade.

**The Court:** Excuse me. Excuse me. Hold it. There's an objection. What's the objection?

**Counsel:** Objection the family members have suffered. They are not here in this case.

**The Court:** Hold it. It's up to the jury to infer from the evidence they have heard what might be considered natural consequences of a result like this.

**Prosecutor:** Thank you, Your Honor.

**The Court:** But at the same time counsel is correct. You must decide the case only from evidence or lack of evidence, no other reason.

N.T. 6/17/1998, at 104–06. To the extent appellant alleges that the prosecutor's argument served to introduce "evidence," he is mistaken. It is well settled in the law that attorneys' statements or questions at trial are not evidence. *LaCava*, 666 A.2d at 231 (citation omitted). Indeed, the trial court clearly instructed the jury to this effect. *See* N.T. 6/12/1998, at 3. As we have noted, the jury is presumed to have followed the court's instructions. *LaCava*.

▮▮▮▮ Turning to the question of the propriety of the remarks as argument, we note that remarks made by a prosecutor must be evaluated in the context in which they occur. *Commonwealth v. Carpenter*, 533 Pa. 40, 617 A.2d 1263, 1267 (1992) (citation omitted). Furthermore, the prosecutor may fairly respond to points made in the defense closing. *Commonwealth v. Weiss*, 565 Pa. 504, 776 A.2d 958, 968 (2001)

(citation omitted). The prosecutor's remarks here concerning the suffering of the victims' family members, and referring to the delay that resulted from appellant's flight, evidence that was of record, were offered to counter defense counsel's assertion during his closing argument at the guilt phase that the murder victims did not suffer. *See* N.T. 6/17/1998, at 78–79 ("There wasn't, you know, brutalization and suffering imposed on these people."). Such an argument arguably falls within permissible responsive bounds. *See Commonwealth v. Ligons,* 565 Pa. 417, 773 A.2d 1231, 1238–39 (2001) (prosecutor's remarks touching upon the victim and his family were proper where they were offered to counter sympathy associated with defendant's mitigating evidence that he was good father, helped care for his grandmother, endured difficult childhood, and had been unloved and abandoned by his mother); *Commonwealth v. Jones,* 546 Pa. 161, 683 A.2d 1181, 1203 (1996) (prosecutor's statement as to what victims' families might have said had they testified regarding defense requests for sympathy and leniency constituted permissible rebuttal of defense mitigation evidence). But, in any event, the trial court specifically instructed the jury that it was to "decide the case only from evidence or lack of evidence, no other reason." This instruction adequately addressed any prejudice that may have followed from the prosecutor's brief responsive references to the victims' families.

■■■ Appellant also objects that the prosecutor allegedly "improperly implored the jury to do 'justice' for the victims' families" when he stated near the end of his guilt phase summation:

I told you I would prove to you beyond a reasonable doubt through the evidence that this defendant is guilty of first-degree murder. I've done my job and when I sit down, I will be satisfied, okay, that I did my job and I represented the Commonwealth, these victims' family, [sic] the best of my ability and that I proved the defendant guilty.

The only thing I can hope and the only thing that these people in the courtroom can hope is that you walk in here

for justice. Justice, ladies and gentlemen, in this case is nothing less than first-degree murder. . . .

N.T. 6/17/1998, at 109. As this excerpt from the record reflects, the prosecutor stated only that, having done his job in representing the Commonwealth, including the victims' families, he submitted that he had proved appellant guilty of first-degree murder, and that such would be a just verdict. The fact that the prosecutor argued that the evidence adduced at trial warranted a verdict of first-degree murder, with a degree of oratorical flair, was not improper, particularly in light of the wide latitude counsel are accorded in making argument to the jury. *See Commonwealth v. Marshall,* 534 Pa. 488, 633 A.2d 1100, 1107 (1993).

■ Appellant next accuses the trial prosecutor of deliberately eliciting victim impact testimony from Lloyd Traywood, a character witness called by appellant during the penalty phase, on cross-examination as follows:

**Prosecutor:** Mr. Traywood, sir, you knew Miss Shamsid Din, Jackie?

**Traywood:** Yes.

**Prosecutor:** Very peaceful woman?

**Traywood:** As far as I know.

**Prosecutor:** Very nice woman when she was in your company?

**Traywood:** Yes.

N.T. 6/18/1998, at 23. Appellant did not object to this line of questioning below. Thus, the prosecutor had no opportunity to explain the purpose of the inquiry, nor was the trial court afforded an opportunity to determine whether it was misconduct and, if so, what remedial measure should be taken. The Commonwealth now suggests that the purpose of the testimony was not victim-impact evidence, but to rebut an anticipated claim by appellant, who was intending to testify at the penalty phase, that the victim provoked appellant.

On this state of the record, we cannot determine that the line of inquiry was necessarily invalid, nor would we assume that an attorney intends the worst possible interpretation of

an event. In any event, even assuming *arguendo* that this very brief, non-specific testimony that, prior to her murder, Shamsid–Din was a "peaceful" woman, and that she was "nice" when she was in Traywood's company constituted victim impact testimony, it was so fleeting and general that it cannot be said that it rendered the jury incapable of returning a fair and impartial sentencing verdict. *See Commonwealth v. Rollins,* 558 Pa. 532, 738 A.2d 435, 447 (1999) (even if considered victim impact evidence, brief testimony that boy was afraid of guns as result of witnessing crime did not prejudice defendant).

 In addition, appellant contends that the prosecutor deliberately introduced victim impact evidence at the penalty phase when, in cross-examining appellant, he asked, "Sir, isn't it a fact that your sister-in-law called the police on you down in D.C. and if she didn't call the police, you would still be running and these people here still would be grieving?" N.T. 6/18/1998, at 52. This question followed closely on the heels of appellant's claim on direct examination that he felt remorse for the killings. *See id.* at 50–51. Viewed in context, this question was not an effort to highlight the impact the murders had on the victims' families. Rather, the prosecutor sought to rebut appellant's claim that he was "sorry" about the killings by eliciting testimony that he had, in fact, fled the jurisdiction following the murders and would have continued to avoid law enforcement had his sister-in-law not informed the police of his whereabouts—circumstances that reflect an unwillingness to take responsibility for his actions. Furthermore, no error lies on this point because the jury had been previously instructed that the prosecutor's questions were not evidence, and the trial court interjected before appellant had an opportunity to respond to the question, and directed the prosecutor to ask a different question.

Appellant also accuses the prosecutor of deliberately introducing victim impact considerations during his penalty phase summation. Appellant particularly objects to the prosecutor's statement at the outset of his closing argument acknowledging the presence of "the Court, counsel, members of the jury, [and] Shamsid–Din family." N.T. 6/18/1998, at 75. In addi-

582

tion, appellant takes specific issue with the prosecutor's statement that, if it were up to appellant, "we would never be here and the justice that you people give to the victims' family members would never have happened today because he was on the run," as well as his assertion that the jury should return a sentence of death "in the same cold deliberate manner that [appellant] executed these people." *Id* at 81.

Once again, we note that, within reasonable bounds enforced by the trial court, a prosecutor may employ oratorical license and impassioned argument in arguing for the death penalty. *See Commonwealth v. Washington*, 549 Pa. 12, 700 A.2d 400, 414 (1997); *Travaglia*, 541 Pa. 108, 661 A.2d 352, 365 (1995). While reference to irrelevant matters should be avoided, we note that murder victims are not simply props or irrelevancies in a murder prosecution, and innocuous references to victims and their families are not necessarily prejudicial. In this case, the prosecution did not refer to the victims or the impact of their deaths on their families as an independent reason, outside of the statutory factors the jury was charged to consider, why the jury should return verdicts of death. Indeed, the prosecutor's first reference to the victims' families was part of an innocuous introductory statement acknowledging the presence of the various people in the courtroom that day. It cannot seriously be maintained that any prejudice followed from this passing reference. The second reference was primarily a comment on the evidence properly admitted at trial concerning appellant's flight from the jurisdiction following the murders and the many years that passed before his eventual apprehension. The fact that the prosecutor emphasized the point by reference to the victims' families' wait for justice, does not approach the type of overly aggressive or highly inappropriate advocacy that "could have impermissibly shifted the balance in favor of a death sentence" that this Court has deemed to be improper. *LaCava*, 666 A.2d at 237. *Compare id.* (prosecutor's lengthy argument during penalty phase summation that jury should sentence appellant to death as form of retribution for ills inflicted on society by those who sell drugs went far beyond

permissible limits of oratorical flair and aggressive advocacy) *and Commonwealth v. Chambers,* 528 Pa. 558, 599 A.2d 630, 643 (1991) (prosecutor's statement to jury in sentencing summation that Bible says "and the murderer shall be put to death" was prejudicial).

The prosecutor's statement that the jury should render its sentencing verdict in the "same cold deliberate manner" that appellant killed the victims was also not improper. This Court has consistently found permissible similar statements asking the jury to show the defendant the same mercy that he showed his victim. *See Commonwealth v. Hackett,* 558 Pa. 78, 735 A.2d 688, 696–97 (1999) (prosecutor's remark in closing argument of penalty phase that jury should show defendants "the same mercy they showed Maureen Dunne" was permissible); *Commonwealth v. Rompilla,* 554 Pa. 378, 721 A.2d 786, 791 (1998) (prosecutor's comments in closing argument of penalty phase were permissible where prosecutor stated "I'm only asking you to show the same mercy to him that he showed to Jimmy Scanlon"); *Commonwealth v. Washington,* 549 Pa. 12, 700 A.2d 400, 415–16 (1997) (prosecutor's comments in closing argument of penalty phase were permissible where prosecutor asked jury "to give Anthony Washington the same sympathy and mercy that he showed to Tracey Lawson when he gunned him down in cold blood right between the eyes, right in the head"). Accordingly, this claim also fails.[13]

Finally, appellant contends that he is entitled to relief due to the cumulative effect of the foregoing instances of prosecutorial misconduct. It is settled, however, that "no number of failed claims may collectively attain merit if they

13. Because we have concluded that no improper victim impact evidence was introduced at either the guilt or penalty phases of appellant's trial, appellant's additional claim that the trial court erred in failing to instruct the jury regarding victim impact evidence may be summarily rejected. It is axiomatic that the trial court does not err when it fails to give an instruction that is not warranted by the evidence introduced at trial. Moreover, it bears noting that appellant never requested such an instruction, nor does he suggest that the trial court was required to issue one *sua sponte.*

could not do so individually." *Commonwealth v. Bracey*, 787 A.2d 344, 358 (Pa.2001) (quoting *Commonwealth v. Williams*, 532 Pa. 265, 615 A.2d 716, 722 (1992)). Because appellant has failed to demonstrate that any of his claims of prosecutorial misconduct warrant relief individually, they do not do so when considered collectively.

■ In his final and related claim for relief, appellant contends that he is entitled to a new trial and sentencing hearing due to the cumulative effect of the foregoing instances of alleged trial court error, prosecutorial misconduct, and ineffective assistance of counsel. As we have discussed above, consideration of appellant's ineffectiveness claims must await collateral review. Regarding appellant's claims of trial court error and prosecutorial misconduct, as we have also noted above, it is well-settled that "no number of failed claims may collectively attain merit if they could not do so individually." *Bracey, supra.* Since appellant has failed to demonstrate that any of his claims warrant relief individually, they do not do so when considered *in toto*.

## V. Statutory Review

■ Finally, as noted above, this Court is required to conduct a statutory review of the death sentence. Pursuant to 42 Pa.C.S. § 9711(h)(3), this Court must affirm the sentence of death unless we determine that:

> (i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (ii) the evidence fails to support the findings of at least one aggravating circumstance specified in subsection (d).

*Id.* After careful review of the record below, we conclude that the sentence imposed was not a product of passion, prejudice or any other arbitrary factor. Second, the evidence produced at trial and on record is sufficient to establish the aggravating factor found by the jury: that appellant had been convicted of another murder at the time of the current offense. The jury found one aggravating factor and no mitigating factors, thus it

was statutorily required to impose a sentence of death. 42 Pa.C.S. § 9711(c)(1)(iv).

Accordingly, we affirm the verdict and sentence of death imposed upon appellant by the Court of Common Pleas of Philadelphia County.[14]

Justice SAYLOR files a concurring and dissenting opinion.

Justice SAYLOR concurring and dissenting.

I respectfully differ with the majority's view that the doctrine of relaxed waiver, as originally conceived and implemented, was an exclusively judicial creation devoid of reasoned supporting rationale. *See* Majority Opinion at 400–01, 402–03. Pennsylvania's current death penalty statute, which was addressed in *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), obligates the Court on direct appeal to review whether a "sentence of death was the product of passion, prejudice, or any other arbitrary factor," and whether sufficient evidence supports the finding of at least one aggravating circumstance. 42 Pa.C.S. § 9711(h)(3)(i), (ii). This review procedure was modeled after the Georgia death penalty statute that was upheld in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). *See* Legis. J.—Senate at 723 (June 26, 1978). The parallel provision in the Georgia death penalty statute, GA.CODE ANN. § 17–10–35, is employed as a basis for relaxed waiver, particularly in relation to issues connected with the sentencing phase of trial. *See Conner v. State*, 251 Ga. 113, 303 S.E.2d 266, 275 (1983) (collecting cases).[1] Indeed, it was pursuant, *inter alia*, to this statutory obligation that *Zettlemoyer* addressed those issues that had not been properly preserved. *See Zettlemoyer*, 500 Pa. at 50

---

14. The Prothonotary of this Court is directed to transmit to the Governor's office a full and complete record of the trial, sentencing hearing, imposition of sentence and opinion and order by the Supreme Court in accordance with 42 Pa.C.S.A. § 9711(i).

1. *Cf. Gissendaner v. State*, 272 Ga. 704, 532 S.E.2d 677, 688 (2000) (reviewing an otherwise waived issue regarding a prosecutor's guilt phase closing argument pursuant to the statutory obligation in capital cases to "consider whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor").

& n. 19, 454 A.2d at 955 & n. 19 ("[B]ecause this Court has an independent, statutory obligation to determine whether a sentence of death was the product of passion, prejudice or some other arbitrary factor, whether the sentence is excessive or disproportionate to that imposed in similar cases, and to review the record for sufficiency of the evidence to support aggravating circumstances, we will not adhere strictly to our normal rules of waiver."); *see also id.* at 26 n. 3, 454 A.2d at 942 n. 3 (reviewing the sufficiency of the evidence pursuant to 42 Pa.C.S. § 9711(h)).[2] Therefore, unlike the majority, I view aspects of the relaxed waiver rule as grounded in the Court's statutory mandate, although concededly review has come to be afforded on broader terms.

I do agree with the majority that the Court's efforts to accommodate the staple invocation of relaxed waiver in capital direct appeals has too greatly burdened the appellate process. I also believe that it would not impede the performance of the Court's statutory obligations to: 1) limit relaxed waiver to claims directly implicating the integrity of the penalty-phase proceedings; 2) exercise sound discretion in selecting which unpreserved, sentencing-phase claims implicating potential passion/prejudice/arbitrariness may merit express treatment in a written opinion of this Court; and 3) apply a prejudice component (i.e., a determination whether there is a reasonable probability that, but for the error or omission, the result of the proceedings would have been different) to the review under this relaxed waiver construct. *Cf. United States v. Olano,* 507 U.S. 725, 732–34, 113 S.Ct. 1770, 1776–78, 123 L.Ed.2d 508 (1993) (articulating, *inter alia,* the discretionary aspect and

**2.** The decision in *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288 (1983), is not to the contrary, as the Court in that case recognized that review under Section 9711(h) may permit certain issues to be addressed *sua sponte* in a capital appeal. *See id.* at 505 n. 5, 467 A.2d at 304 n. 5; *accord Commonwealth v. Stoyko,* 504 Pa. 455, 472 n. 7, 475 A.2d 714, 724 n. 7 (1984).

It should be noted that the General Assembly has repealed Section 9711(h)(3)(iii) of the Judicial Code, 42 Pa.C.S. § 9711(h)(3)(iii), which required proportionality review; however, the Legislature has left intact the obligation on direct appeal to review for passion, prejudice, or any other arbitrary factor affecting the sentence. *See* 42 Pa.C.S. § 9711(h)(3)(i).

prejudice requirement of the standard for federal, plain error).[3] Otherwise, I am in agreement with the majority that the statutory, post-conviction process (along with the routine affordance of a stay of execution to permit litigation of a timely-filed, first post-conviction petition) adequately serves the function of an essential safeguard.

Second, I do not support the majority's multiple characterizations of statements of the district attorney during his penalty presentation in this case, and of analogous remarks reviewed in other decisions, as innocuous. *See, e.g.,* Majority Opinion at 409, 415. To the contrary, I believe that all of the referenced statements were weighty points directed to securing, and militating in favor of, the imposition of the penalty of death. I agree with the majority, however, that the statements were not so prejudicial that the jury could not weigh the evidence objectively and render a true verdict.

Finally, I would disapprove the prosecutorial practice of asking capital sentencing juries to render verdicts in the same cold deliberate manner as the victim was killed, since under the Eighth and Fourteenth Amendments to the United States Constitution, the obligation of jurors is to follow the law, not the lawless mindset of the killer. *Cf. Penry v. Johnson,* 532 U.S. 782, 797–98, 121 S.Ct. 1910, 1920–21, 150 L.Ed.2d 9 (2001); *Commonwealth v. King,* 554 Pa. 331, 359–60, 721 A.2d 763, 777 (1998).

---

**3.** Significantly, most jurisdictions permit an appellate court to reverse on the basis of plain error. *See* 5 Wayne R. LaFave et al., Criminal Procedure § 27.5(d) (2d ed.1999).